## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

OSWALD THOMPSON, JR.,
individually and on behalf of all
others similarly situated, *et al.*,

      Plaintiffs,

      v.

SHERIFF THEODORE
JACKSON, CHIEF MARK
ADGER, and JOHN DOE
DEFENDANTS,

      Defendants.

:
:
:
:
:
:
:
:
:
:
:
:
:
:

CIVIL ACTION NO.
1:16-CV-4217-RWS

## **ORDER**

This case comes before the Court on Defendants' Motion to Dismiss

Plaintiffs' Original Complaint [3], Defendants' Motion to Dismiss Plaintiffs'

Third Amended Complaint [12], and Plaintiffs' Motion to Certify Class [10].

After reviewing the record, the Court enters the following Order.

### **Background[1]**

This civil rights case arises out of the alleged overdetention of at least

---

[1] Because this case is before the Court on a Motion to Dismiss, the Court
accepts the facts alleged in the complaint as true. Cooper v. Pate, 378 U.S. 546, 546
(1964).

one hundred inmates at the Fulton County Jail ("Jail") in November 2014 due to an outage of the Georgia Crime Information Center ("GCIC") system. Plaintiffs are ten individuals who were allegedly overdetained during that time. They sue on behalf of themselves and a putative class of all of the allegedly overdetained inmates.  There are two named Defendants: Fulton County Sheriff Theodore Jackson; and the Jail's Chief Jailer, Mark Adger.  Along with the named Defendants, Plaintiffs also bring suit against unnamed Jail employees, or "John Doe Defendants."

On ten or more days in November 2014, the GCIC system became inoperable at the Jail, possibly because the Jail's computer system had not been properly updated.  (Third Am. Compl., Dkt. [9] ¶¶ 35, 36.)  This outage was not an isolated incident.  Before November 2014, the GCIC system had become inoperable on at least three other occasions for durations of one to four days. (Id. ¶ 41.)  Sheriff Jackson and Chief Adger were both aware of those prior outages.  (Id. ¶ 101.)

Under the Jail's written policy in effect in November 2014, inmates scheduled for release were required to be run through the GCIC system to check for active warrants, detainers, or holds.  (Id. ¶ 37.)  That policy

originated from the Jail alone and was not required by any state or federal law, rule, or regulation. (Id. ¶ 38.) Sheriff Jackson and Chief Adger both had the authority to waive the Jail's policy and did, in fact, release inmates without running them through the GCIC system on at least one occasion in November 2014. (Id. ¶¶ 39-40, 43.) Because of the repeated GCIC system outages, Chief Adger had instructed Jail employees to release inmates during prolonged GCIC system outages if the inmates met certain criteria. (Id. ¶ 42.) One of those criteria was if the inmates had been booked into the Jail within 48 hours of the outage. (Id.) Still, those criteria did not cover every inmate, and Sheriff Jackson and Chief Adger authorized their subordinates to overdetain inmates during GCIC system outages. (Id. ¶ 103.) They did so even though former lawsuits, consent orders, and audits of the GCIC system's operability had put them on notice of the widespread abuse related to overdetention. (Id. ¶ 106.)

Each of the ten named Plaintiffs were among the inmates overdetained during the November 2014 GCIC system outage. (Id. ¶ 44.) Each Plaintiff posted bond, but was then held at the Jail for an additional period of time until they could be run through the GCIC system. (See, e.g., id. ¶¶ 51, 56, 62.) That additional period of time ranged from three to four and a half days. (See, e.g.,

3

id. ¶¶ 48, 57, 63.)

Sheriff Jackson and Chief Adger were both responsible for the November 2014 overdetentions. Sheriff Jackson instructed Chief Adger to hold Plaintiffs and the other putative class members until they could be run through the GCIC system. (Id. ¶ 94.) Chief Adger, in turn, instructed his subordinates to do the same. (Id. ¶ 95.) Along with the named Defendants, other Jail employees—the John Doe Defendants—also played a role in Plaintiffs' overdetentions. The John Doe Defendants were involved in the process of calculating release times and/or processing inmate releases at the Jail. (Id. ¶ 108.) As employees in the Jail's Release Office, the John Doe Defendants knew that the overdetentions were occurring in November 2014. (Id. ¶ 109.) Still, they did not timely release the affected inmates. (Id. ¶ 114.)

Plaintiffs originally filed this case in the Superior Court of Fulton County. While still in that court, the parties filed two motions that are now pending on this Court's docket: Defendants' Motion to Dismiss Plaintiffs' Original Complaint [3], and Plaintiffs' Motion to Certify Class [10]. Defendants removed the case to this Court after Plaintiffs filed their Third Amended Complaint [9]. In that Complaint, Plaintiffs bring two claims against

4

Sheriff Jackson and Chief Adger: a state law claim for breach of ministerial duty through false arrest, false imprisonment, and negligence (Count I); and a federal claim under 42 U.S.C. § 1983 for false imprisonment and overdetention in violation of the Fourth, Eighth, and Fourteenth Amendments (Count III). Plaintiffs also bring two identical claims against the John Doe Defendants (Counts II and IV). In their prayer for relief, Plaintiffs seek both damages and a permanent injunction enjoining Defendants from overdetaining any inmate and requiring them to implement policies to ensure that inmates are not overdetained during GCIC system outages. Defendants now move to dismiss all of Plaintiffs' claims under Federal Rule of Civil Procedure 12(b)(6).

## Discussion

## I.     Defendants' Motion to Dismiss Plaintiffs' Third Amended Complaint [12][2]

### A.     Legal Standard

Federal Rule of Civil Procedure 8(a)(2) requires that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to

---

[2] Defendants' Motion to Dismiss Plaintiffs' Original Complaint [3], which was first filed in Superior Court, is **DENIED as moot** in light of Plaintiffs' Third Amended Complaint.

5

relief." While this pleading standard does not require "detailed factual allegations," "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). In order to withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Id. (quoting Twombly, 550 U.S. at 570). A complaint is plausible on its face when the plaintiff pleads factual content necessary for the court to draw the reasonable inference that the defendant is liable for the conduct alleged. Id.

At the motion to dismiss stage, "all-well pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff." Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1273 n.1 (11th Cir. 1999). However, the same does not apply to legal conclusions set forth in the complaint. Sinaltrainal v. Coca-Cola Co., 578 F.3d 1252, 1260 (11th Cir. 2009) (citing Iqbal, 556 U.S. at 678). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678. Furthermore, the court does not "accept as true a legal conclusion couched as a factual allegation." Twombly, 550 U.S. at

6

555.

### B.     John Doe Defendants

Defendants argue that the John Doe Defendants must be dismissed

because "[a]s a general matter, fictitious-party pleading is not permitted in

federal court." Richardson v. Johnson, 598 F.3d 734, 738 (11th Cir. 2010).

Plaintiffs do not oppose that argument.  Thus, Defendants' Motion to Dismiss

is **GRANTED** as to Plaintiffs' claims against the John Doe Defendants (Counts

II and IV).

### C.     Section 1983 Claims Against Sheriff Jackson and Chief Adger

Plaintiffs sue Sheriff Jackson and Chief Adger (hereafter "Defendants")

under 42 U.S.C. § 1983 for violating their constitutional rights by falsely

imprisoning and overdetaining them.  Plaintiffs do not specify the capacity in

which they bring their § 1983 claims, but Defendants move for dismissal as if

Plaintiffs are suing them in both their official and individual capacities.  The

Court will, therefore, analyze both.

#### 1.     *Official Capacity § 1983 Claims*

When officials like Sheriff Jackson and Chief Adger are sued in their

official capacities, those suits are construed as suits against the entity to whom

AO 72A
(Rev.8/82)

the official is responsible—i.e. the county or the state. See Kentucky v. Graham, 473 U.S. 159, 165 (1985) ("Official-capacity suits . . . generally represent only another way of pleading an action against an entity of which an officer is an agent.").  In other words, government officials sued in their official capacity "assume the identity of the government that employs them." Hafer v. Melo, 502 U.S. 21, 27 (1991).  For the official capacity claims in this case, Defendants argue that they assume the identity of the State of Georgia, not Fulton County.  That distinction makes a difference because states enjoy defenses that municipalities do not. See Will v. Michigan Dep't of State Police, 491 U.S. 58, 70 (1989) ("States are protected by the Eleventh Amendment while municipalities are not.").  Compare GeorgiaCarry.Org, Inc. v. Georgia, 687 F.3d 1244, 1254 (11th Cir. 2012) ("The State of Georgia . . . is not a 'person' subject to suit under § 1983."), with City of St. Louis v. Praprotnik, 485 U.S. 112, 121 (1988) ("[M]unicipalities and other bodies of local government are 'persons' within the meaning of [§ 1983].")

"Whether a defendant is an 'arm of the State' must be assessed in light of the particular function in which the defendant was engaged when taking the actions out of which liability is asserted to arise." Manders v. Lee, 338 F.3d

1304, 1308 (11th Cir. 2003).  Here, that function is the administration of release policies at the Jail.  Importantly, Plaintiffs offer no argument that such a function is one that officials perform as county officials rather than as an arm of the state.  But even if Plaintiffs did not concede that point, Eleventh Circuit precedent dictates that the administration of county jail policies is indeed a state function.

For example, in Manders, the Eleventh Circuit held that a Georgia sheriff's "authority and duty to administer the jail in his jurisdiction flows from the State, not [the] County." Id. at 1315.  Likewise, in Purcell ex rel. Estate of Morgan v. Toombs County, 400 F.3d 1313 (11th Cir. 2005), the court held that a Georgia sheriff "functions as an arm of the State—not of [the] [c]ounty—when promulgating policies and procedures governing conditions of confinement at the [county jail]." Id. at 1325.  Consistent with those cases, at least one other district court has held that the precise function at issue here is a state function.  See Bunyon v. Burke Cty., 306 F. Supp. 2d 1240, 1255 (S.D. Ga. 2004) (finding that a county sheriff acted as an arm of the state when establishing bail and release policies at the county jail).  Accordingly, the Court finds that Defendants acted as an arm of the state when they administered

9

release policies at the Jail.  Defendants thus "assume the identity" of the State

of Georgia for purposes of Plaintiffs' official capacity claims, Hafer, 502 U.S.

at 27, and may assert the same defenses available to the State.  See Graham,

473 U.S. at 167 ("The only immunities that can be claimed in an official-

capacity action are forms of sovereign immunity that the entity, *qua* entity, may

possess, such as the Eleventh Amendment.").[3]

On those grounds, Defendants argue that they are entitled to immunity

under the Eleventh Amendment, which protects states and its officials from

federal suits for money damages.  See Edelman v. Jordan, 415 U.S. 651, 662-63

(1974).[4]  The Eleventh Amendment does not, however, bar suits for prospective

---

[3] While the cases cited above discuss only sheriffs, the Court's finding applies to both Sheriff Jackson *and* Chief Adger.  See, e.g., Morgan v. Fulton Cty. Sheriff's Dep't, No. 1:05-CV-1576-JOF, 2007 WL 1810217, at *5 (N.D. Ga. June 1, 2007) ("In a line of cases interpreting Manders, the courts in this circuit have determined that when a sheriff is acting as an arm of the state, his deputies are also entitled to Eleventh Amendment immunity.").

[4] The text of the Eleventh Amendment is as follows: "The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. CONST. amend. XI.  While that language does not appear to bar suits against a State by its own citizens, the Supreme Court "has consistently held that an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State." Edelman, 415 U.S. at 662-63.

relief because "official-capacity actions for prospective relief are not treated as actions against the State." Graham, 473 U.S. at 167 n.14. In their Third Amended Complaint, Plaintiffs seek both money damages *and* an injunction requiring Defendants to adopt and implement policies to ensure that inmates are not overdetained during future GCIC system outages. So while the Eleventh Amendment shields Defendants from Plaintiffs' official capacity § 1983 claims for money damages, it does not shield them from Plaintiffs' claims for injunctive relief.

Plaintiffs counter, arguing that Eleventh Amendment immunity does not apply here at all because Defendants waived that immunity by voluntarily removing this case to federal court. See Lapides v. Bd. of Regents of Univ. Sys. of Ga., 535 U.S. 613 (2002). In Lapides, the Supreme Court held that "removal is a form of voluntary invocation of a federal court's jurisdiction sufficient to waive the State's otherwise valid objection to litigation of a matter . . . in a federal forum." Id. at 624. But that holding is narrower than it appears at first blush. The Supreme Court expressly limited its holding in Lapides to "state-law claims . . . [where] the State has explicitly waived immunity from state-court proceedings." Id. at 617. The Eleventh Circuit, however, has

11

applied that holding to both federal and state law claims.  See Stroud v.
McIntosh, 722 F.3d 1294, 1300 (11th Cir. 2013).  In other words, "the source
of a plaintiff's claim against a state (state law or federal law) is irrelevant to
whether a state waives its immunity against that claim by removing to federal
court."  Id.

Yet in applying Lapides, the Eleventh Circuit also draws a distinction
between a waiver of immunity from *federal jurisdiction* and a waiver of
immunity from *liability*.  Id. at 1301.  While removal to federal court waives
the "immunity-based objection to a federal forum," the state may nonetheless
"retain[ ] its immunity from liability."  Id.  The question, then, is whether
Defendants have retained their immunity from § 1983 liability.

The Supreme Court addressed that same question in Lapides.  It limited
its discussion to state law claims because, even though the plaintiff also
brought a § 1983 claim, the case "[did] not present a valid federal claim against
the State."  Lapides, 535 U.S. at 617.  That is true in this case, too.  Even if
Defendants *did* waive their immunity from § 1983 liability, they are still
protected because States and their officials are not "persons" suable under §
1983.  See id.; Will, 491 U.S. at 71 ("[N]either a State nor its officials acting in

12

their official capacities are 'persons' under § 1983."). And, unlike with Eleventh Amendment immunity, this defense is not waivable. See Arizonans for Official English v. Arizona, 520 U.S. 43, 69 (1997). So even if Plaintiffs' official capacity claims are not barred by Eleventh Amendment immunity, those claims still fail because, as the Supreme Court noted in Lapides, neither a state nor its officials can be sued under § 1983.

That being said, this defense carries the same caveat as Eleventh Amendment immunity—it bars claims for money damages, but not claims for injunctive relief. See Will, 491 U.S. at 71 n.10 ("Of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 . . . ."). Thus, Plaintiffs' official capacity claims for money damages must be **DISMISSED**. To the extent those same claims are for prospective injunctive relief, however, they remain in the case.

### 2.  *Individual Capacity § 1983 Claims*

Plaintiffs also bring § 1983 claims against Defendants in their individual capacities, arguing that Defendants violated their Fourteenth Amendment rights by overdetaining them. Defendants, in turn, argue that those claims must be dismissed due to qualified immunity. "Qualified immunity offers complete

13

protection for individual public officials performing discretionary functions 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Sherrod v. Johnson, 667 F.3d 1359, 1363 (11th Cir. 2012) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  To claim qualified immunity, a defendant must first show he was performing a discretionary function.  Moreno v. Turner, 572 F. App'x 852, 855 (11th Cir. 2014).  "Once discretionary authority is established, the burden then shifts to the plaintiff to show that qualified immunity should not apply."  Edwards v. Shanley, 666 F.3d 1289, 1294 (11th Cir. 2012) (quoting Lewis v. City of W. Palm Beach, 561 F.3d 1288, 1291 (11th Cir. 2009)).  A plaintiff demonstrates that qualified immunity does not apply by showing: "(1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." Moreno, 572 F. App'x at 855.

The parties make no arguments about whether Defendants were performing discretionary functions when they allegedly violated Plaintiffs' constitutional rights.  Nonetheless, the Court finds that they were.  "To determine whether an official was engaged in a discretionary function, [the

14

court] consider[s] whether the acts the official undertook 'are of a type that fell within the employee's job responsibilities.'" <u>Crosby v. Monroe Cty.</u>, 394 F.3d 1328, 1332 (11th Cir. 2004) (quoting <u>Holloman ex rel. Holloman v. Harland</u>, 370 F.3d 1252, 1265 (11th Cir. 2004)).  Here, the implementation and adoption of jail release policies fall squarely within the job responsibilities of a county sheriff and a chief jailer.  <u>See William v. Williams</u>, No. 1:10CV34-WHA-SRW, 2010 WL 779290, at *3 (M.D. Ala. Mar. 5, 2010) ("Holding and releasing prisoners is within the scope of the discretionary authority of jail administrators and jailers.").  Thus, two inquiries remain: whether Plaintiffs have alleged sufficient facts to show a violation of their constitutional rights and, if so, whether those rights were clearly established at the time in question.

      a.      **Have Plaintiffs Alleged a Constitutional Violation?**

Plaintiffs argue that Defendants violated their Fourteenth Amendment due process rights by overdetaining them.  At the outset, however, the Court notes that Defendants are supervisory officials, and Plaintiffs allege that their Fourteenth Amendment rights were violated by both Defendants and their subordinates (the John Does). As supervisory officials, Defendants are only liable under § 1983 for the unconstitutional acts of their subordinates if they

"personally participated" in the allegedly unconstitutional conduct or if "there is a causal connection between the[ir] actions . . . and the alleged constitutional deprivation." Cottone v. Jenne, 326 F.3d 1352, 1360-61 (11th Cir. 2003).  So the analysis must take two steps.  First, the Court must decide if Plaintiffs have alleged that Defendants' subordinates violated Plaintiffs' Fourteenth Amendment rights by overdetaining them.  Then, if the answer to that question is yes, the Court must decide whether Plaintiffs have alleged that Defendants either personally participated in those violations or if their own actions were causally related to those violations.

i.   Have Plaintiffs Alleged That Defendants' Subordinates Violated Plaintiffs' Constitutional Rights?

It is well established that detainees possess "[t]he constitutional right to be free from continued detention after it was or should have been known that the detainee was entitled to release." Cannon v. Macon Cty., 1 F.3d 1558, 1563 (11th Cir. 1993); see also Douthit v. Jones, 619 F.2d 527, 532 (5th Cir. 1980).[5]  To state a claim for the violation of that right, Plaintiffs must allege

---

[5] The Eleventh Circuit has adopted as binding precedent all Fifth Circuit decisions before October 1, 1981.  Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

both "common law false imprisonment and a due process violation under the

Fourteenth Amendment." Campbell v. Johnson, 586 F.3d 835, 840 (11th Cir.

2009). Plaintiffs have alleged both.

"The elements of common law false imprisonment are an intent to

confine, an act resulting in confinement, and the victim's awareness of

confinement." Id. Here, Plaintiffs allege that Defendants' subordinates were

personally aware that the overdetentions were occurring because they were

responsible for calculating release times and processing inmate releases at the

Jail. (Third Am. Compl., Dkt. [9] ¶¶ 108-11, 154-55, 162.) Despite their

knowledge, those subordinates did not begin the release process for the

affected inmates and continued to detain them improperly. (Id.) While

Plaintiffs do not specifically allege that they were aware of their confinement, it

is hard to imagine how they could not have been, and Defendants do not

contest that element. As a result, Plaintiffs have successfully alleged common

law false imprisonment.

Turning to the Fourteenth Amendment due process violation, Plaintiffs

must allege that Defendants' subordinates "acted with deliberate indifference to

Plaintiffs' due process rights." West v. Tillman, 496 F.3d 1321, 1327 (11th

17

Cir. 2007); accord Campbell, 586 F.3d at 840.  Deliberate indifference requires

showing that the defendant "had subjective knowledge of a risk of serious harm

and disregarded that risk by actions beyond mere negligence." Campbell, 586

F.3d at 840.  Again, Plaintiffs allege that Defendants' subordinates knew that

Plaintiffs were due for release, but continued to detain them anyway.  That

allegation separates this case from others where the overdetention was the

result of mere negligence.  See West, 496 F.3d at 1327-28 (finding no

deliberate indifference where the defendants simply made record keeping errors

and there was no evidence that they knew their acts would lead to the plaintiff's

overdetention); Harrison v. Oliver, No. 14-00085-KD-C, 2015 WL 854851, at

*7 (S.D. Ala. Feb. 27, 2015) (dismissing overdetention claim because the

plaintiff did not allege "that any defendant had knowledge of [the plaintiff's]

signed bond or dismissal order and then disregarded the same in a manner that

is greater than negligence.").  In fact, Plaintiffs' allegation that they were

*knowingly* overdetained pulls this case squarely in line with other cases where

the court left overdetention claims in tact.  For example, in Campbell, the

plaintiff brought an overdetention claim against the county sheriff when the jail

refused to release him even though he had posted a property bond.  586 F.3d at

18

839.  The Eleventh Circuit held that the sheriff's deliberate indifference was a jury question because the sheriff may have instructed the jail not to release the plaintiff even though he knew that the plaintiff's property bond was court approved.  Id. at 840-42.  Similarly, here, Plaintiffs have alleged that Defendants' subordinates knew that the grounds for Plaintiffs' detentions had expired, yet they continued to detain Plaintiffs for upwards of four and a half days.  Thus, while "[t]he deliberate indifference standard is 'a difficult burden for a plaintiff to meet,'" West, 496 F.3d at 1327, Plaintiffs have carried that burden for purposes of a motion to dismiss.  And because Plaintiffs have plausibly alleged both common law false imprisonment and a Fourteenth Amendment due process violation, they have alleged that Defendants' subordinates violated their right "to be free from continued detention after it was or should have been known that [they were] entitled to release." Cannon, 1 F.3d at 1565.

### ii.   Have Plaintiffs Alleged That Defendants Are Liable as Supervisors?

Again, "supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior

or vicarious liability." <u>Keith v. Dekalb Cty.</u>, 749 F.3d 1034, 1047 (11th Cir. 2014). Instead, supervisors like Defendants are only liable "where the defendant personally participates in the unconstitutional conduct or there is a causal connection between such conduct and the defendant's actions." <u>Harper v. Lawrence Cty.</u>, 592 F.3d 1227, 1236 (11th Cir. 2010).

Plaintiffs first argue that Defendants are "directly liable"[6] for Plaintiffs' overdetentions because, despite knowing about the history of overdetentions at the Jail caused by GCIC system outages, Defendants "consciously decided to keep over 100 inmates in custody indefinitely." (Pls.' Br. in Opp'n to Defs.' Mot. to Dismiss ("Pls.' MTD Resp."), Dkt. [13] at 11.) Defendants counterargue that Plaintiffs' allegations do not show personal participation because Plaintiffs have not alleged that Defendants were involved in the specific overdetention of any one Plaintiff. More to the point, Defendants note that there are no allegations that they ever met or knew any of the Plaintiffs, nor that they gave instructions to their subordinates about particular inmates.

---

[6] Plaintiffs appear to argue that Defendants are also subject to "direct liability" outside the context of supervisory liability. The Court sees no difference, however, between an analysis of direct liability and an analysis of Defendants' personal participation as a supervisor. As a result, the Court will not separately discuss direct liability.

20

Plaintiffs' allegations do appear to fall into a gray area when it comes to personal participation claims. On the one hand, Defendants allegedly gave instructions specifically in reaction to the November 2014 GCIC system outage that they knew were impacting prisoners in real time. But on the other hand, Plaintiffs do not allege that Defendants personally delayed any individual inmates' releases. Instead, the alleged overdetentions were caused by Defendants' broad policymaking, which stands in contrast to typical cases of personal participation. See, e.g., Smith v. LePage, 834 F.3d 1285, 1298 (11th Cir. 2016) ("Personal participation occurs when, for example, the supervisor inflicts the injury himself."); H.C. by Hewett v. Jarrard, 786 F.2d 1080, 1087 (11th Cir. 1986) (finding that jail superintendent personally participated in the constitutional violation because he "inflicted the injury to [the plaintiff's] shoulder when he threw [the plaintiff] against the wall and metal bunk in the isolation cell.").

Nonetheless, the Court need not decide at this time whether Plaintiffs have alleged Defendants' personal participation in the overdetentions. Even if they have not, Plaintiffs have still alleged the alternative form of supervisory liability—that Defendants' actions were causally connected to Plaintiffs'

overdetentions.  There are three ways to establish such a causal connection: (1) "when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so;" (2) "when a supervisor's custom or policy results in deliberate indifference to constitutional rights;" or (3) "when facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." Harper, 592 F.3d at 1236.  Plaintiffs' allegations touch on all three of those categories.

Plaintiffs claim that overdetentions due to GCIC system outages were a chronic problem at the Jail.  In fact, Defendants allegedly knew that at least three such outages had occurred before the November 2014 outage.  (Third Am. Compl., Dkt. [9] ¶¶ 41, 101.)  Plaintiffs contend that Defendants reacted to those outages by implementing a policy that allowed a small minority of inmates to be released during future outages, but that still made the release of the majority of inmates contingent on a GCIC check.  (Id. ¶¶ 37, 42, 103.)  That policy was in effect when the November 2014 outage struck, and because none of the Plaintiffs fell within the small band of exceptions, that policy caused

AO 72A
(Rev.8/82)

each of them to be overdetained.

Taken together, those allegations state a plausible claim for supervisory liability. In the section above, the Court found that Plaintiffs have alleged that Defendants' subordinates were deliberately indifferent to Plaintiffs' Fourteenth Amendment rights. It is clear, based on Plaintiffs' allegations, that those subordinates were not acting on their own accord. Rather, it was Defendants' policy of mandated GCIC checks that prompted the other Jail officials to stay Plaintiffs' releases until the GCIC system was operable again. Thus, at the very least, Plaintiffs have alleged: (1) that it was Defendants' "custom or policy" that resulted in deliberate indifference to their rights; and (2) that Defendants directed their subordinates—via their GCIC policy—to act unlawfully by overdetaining Plaintiffs. It is also likely, in light of the allegations about Defendants' knowledge of past GCIC system outages, that Plaintiffs have also alleged a "history of widespread abuse." At any rate, Plaintiffs' allegations of supervisory liability are more than enough to push past this stage of the litigation.

In disputing that conclusion, Defendants make much of Plaintiffs' allegation that the GCIC policy provided exceptions so that at least *some*

AO 72A
(Rev.8/82)

inmates were released in the event of an outage. They argue that Defendants'
use of that safety valve shows a concerted effort to avoid overdetentions much
like the supervisory defendants in <u>West</u>, 496 F.3d at 1329-30. In that case, the
plaintiffs alleged that they were overdetained due to understaffing problems at
the jail. <u>Id.</u> The Eleventh Circuit affirmed summary judgment in the
supervisory defendants' favor because they "did not fail to act correctively to
address the [understaffing] problem." <u>Id.</u> at 1330. But in <u>West</u>, the supervisory
defendants took action to correct a preexisting problem. Here, by contrast, the
supposed "corrective" measures—the limited exceptions to Defendants' GCIC
policy—were part of the very policy that allegedly led to the overdetention of
roughly 100 inmates. Even though the alleged GCIC policy may have included
a safety valve for some inmates, Plaintiffs were not among them. Thus,
Plaintiffs have still alleged that, with or without its exceptions, Defendants'
GCIC policy resulted in deliberate indifference to their rights.

> **b.    Was the Alleged Constitutional Violation Clearly
> Established?**

Even though Plaintiffs have alleged that Defendants violated their
Fourteenth Amendment rights, Defendants are still entitled to qualified

AO 72A
(Rev.8/82)

immunity unless Plaintiffs' rights were clearly established in November 2014.

A constitutional right is clearly established "only if its contours are 'sufficiently clear that a reasonable official would understand what he is doing violates that right.'" Vaughan v. Cox, 343 F.3d 1323, 1332 (11th Cir. 2003) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). While the fact patterns of prior cases used to show that a right is clearly established need not be "fundamentally similar" or even "materially similar," the salient question is whether the law at the time of the alleged violation gave officials "fair warning" that their acts were unconstitutional. Holmes v. Kucynda, 321 F.3d 1069, 1078 (11th Cir. 2003) (quoting Hope v. Pelzer, 536 U.S. 730, 740 (2002)).

Defendants argue that there is no authority clearly establishing that overdetentions as short as three to five days are Fourteenth Amendment violations. To support their argument, Defendants cite a handful of cases where courts dismissed overdetention claims based on longer overdetentions. See West, 496 F.3d at 1321 (affirming summary judgment on claims stemming from 8 and 58 day long overdetentions); Moore v. Tartler, 986 F.2d 682, 687 (3d Cir. 1993) (same, but the overdetention was 6 months long). But the length

25

of the overdention is not a critical feature in any of those cases, nor in the other overdetention cases that the Court has reviewed. Instead, courts tend to focus on the defendant's knowledge and the nature of his or her conduct. In <u>Moore</u>, for example, there was no deliberate indifference because the "officials were attempting to resolve the confusion over the sentencing order and were taking affirmative steps during the five months toward that end." 986 F.2d at 687. Likewise, in <u>West</u>, the plaintiffs' claims failed because "the evidence show[ed]—at most—that Defendants . . . were negligent." 496 F.3d at 1237. There is rarely any discussion of the length of the overdetention or how that impacts the analysis.

As a result, it makes no difference that Plaintiffs have not cited a case holding that an overdetention of three to five days is unconstitutional. Officials can have "fair warning" even when there is no case that is "on all fours, with materially identical facts." <u>Holloman</u>, 370 F.3d at 1277. In other words, clearly established "does not mean that a court must have previously found the very action in question unlawful, but it does mean that 'in light of preexisting law the unlawfulness must be apparent.'" <u>Jordan v. Doe</u>, 38 F.3d 1559, 1566 (11th Cir. 1994) (quoting <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987)).

26

The bottom line is that plenty of binding cases establish a "constitutional right to be free from continued detention *after it was or should have been known* that the detainee was entitled to release." Cannon, 1 F.3d at 1563 (emphasis added); accord Campbell, 586 F.3d at 840; see also Whirl v. Kern, 407 F.2d 781, 791 (5th Cir. 1968) ("There is no privilege in a jailer to keep a prisoner in jail beyond the period of his lawful sentence."). Plaintiffs have alleged that Defendants knew they were due for release, but decided not to release them. Accordingly, for purposes of this stage of the litigation, Plaintiffs have alleged the violation of a clearly established constitutional right. Defendants' Motion to Dismiss is **DENIED** as to Plaintiffs' individual capacity § 1983 claims against Defendants.

D.   State Law Claims Against Sheriff Jackson and Chief Adger

Plaintiffs also sue Sheriff Jackson and Chief Adger under state law. As with their § 1983 claims, Plaintiffs do not specify whether they bring their state law claims against Defendants in their official or individual capacities, so the Court will analyze both.

1.   *Official Capacity State Law Claims*

Defendants argue that, to the extent Plaintiffs intend to bring state law

27

claims against them in their official capacities, those claims fail because of sovereign immunity.  In Georgia, "[t]he doctrine of sovereign immunity . . . protects all levels of governments from legal action unless they have waived their immunity from suit."  Cameron v. Lang, 549 S.E.2d 341, 346 (Ga. 2001).  Here, Plaintiffs concede that any state law claims against Defendants in their official capacities would fall under sovereign immunity's protection.  (Pls.' MTD Resp., Dkt. [13] at 19 n.2.)  Thus, Defendants' Motion to Dismiss is **GRANTED** as to any such claims.

2.   *Individual Capacity State Law Claims*

Plaintiffs' state law claims are based on Defendants' alleged negligence in performing ministerial acts.  Specifically, Plaintiffs allege that various provisions of the Georgia code create a ministerial duty to release inmates once the basis for their detention has expired.  According to Plaintiffs, Defendants negligently breached that duty by refusing to release Plaintiffs until they were run through the GCIC system.  Defendants, in turn, argue that Plaintiffs' state law claims fail because of official immunity.

In Georgia, whether a public officer is entitled to official immunity depends on the type of acts he or she was performing.  The Supreme Court of

28

Georgia has put it this way: "The doctrine of official immunity . . . provides that while a public officer or employee may be personally liable for his negligent ministerial acts, he may not be held liable for his discretionary acts unless such acts are wilful, wanton, or outside the scope of his authority." Austin v. Clark, 755 S.E.2d 796, 798 (Ga. 2014) (quoting Gilbert v. Richardson, 452 S.E.2d 476, 482 (Ga. 1994)); accord GA. CONST. art. I, sec. 2, para. IX(d). The key question, then, is whether Defendants' acts were ministerial or discretionary. A ministerial act is "one that is simple, absolute, and definite, arising under conditions admitted or proved to exist, and requiring merely the execution of a specific duty." Gish v. Thomas, 691 S.E.2d 900, 904 (Ga. Ct. App. 2010). A discretionary act, on the other hand, "calls for the exercise of personal deliberation and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed." Golden v. Vickery, 645 S.E.2d 695, 696 (Ga. Ct. App. 2007). Plaintiffs concede that they did not allege the wanton performance of a discretionary duty. (Pls.' MTD Resp., Dkt. [13] at 19 n.3.) Thus, if the Court finds that Defendants' acts were discretionary, Plaintiffs' state law claims must be dismissed. (Id.)

Plaintiffs insist, however, that the act of releasing an inmate once the basis for his or her detention has expired is ministerial. To support that conclusion, Plaintiffs attempt to analogize a sheriff's duty to timely release inmates with a sheriff's duty to provide inmates with medical attention. In Georgia, "[p]roviding adequate medical attention for inmates . . . is a ministerial act by the sheriff . . . because medical care is a fundamental right." Cantrell v. Thurman, 499 S.E.2d 416, 421 (Ga. Ct. App. 1998).[7] That rule is grounded in various provisions of the Georgia code. See id. (citing O.C.G.A. §§ 42-4-4(a)(2), 42-5-2(a)); Middlebrooks v. Bibbs Cty., 582 S.E.2d 539, 542 (Ga. Ct. App. 2003) (same, but also citing O.C.G.A. § 42-4-32(d)). For example, one provision says that "[i]t shall be the duty of the sheriff . . . [t]o furnish persons confined in the jail with medical aid . . . ." O.C.G.A. § 42-4-4(a)(2). Likewise, another provision says that "[t]he officer in charge . . . shall

---

[7] The Georgia Court of Appeals overruled Cantrell in Tattnall County v. Armstrong, 775 S.E.2d 573 (Ga. Ct. App. 2015), but only to clarify that the ministerial/discretionary distinction has nothing to do with a sovereign immunity analysis. Id. at 577 ("[W]e take this opportunity to overrule and disapprove Cantrell . . . to the extent [it] can be read to hold that a discretionary/ministerial act analysis should be applied in deciding whether the sovereign immunity of a county or a county employee sued in his official capacity . . . has been waived for state tort claims."). Tattnall did not alter the rule that providing medical care to inmates is a ministerial act for official immunity purposes.

30

assure that each inmate is observed daily, and a physician shall be immediately called if there are indications of serious injury, wound, or illness." O.C.G.A. § 42-4-32(d).  If those statutes give rise to a ministerial duty to provide medical care, Plaintiffs argue, then similar statutes relating to the release of inmates must likewise give rise to a ministerial duty to release inmates when the grounds for their detention expire.  Perhaps the best example is O.C.G.A. § 42-4-7(b)(2), which says that "[a]n inmate sentenced to confinement as a county inmate shall be released at the expiration of his or her sentence less the time deducted for earned time allowances."  According to Plaintiffs, that statute—just like the statutes relating to the provision of medical care—makes timely release from jail a "fundamental right."  And because of that, Plaintiffs argue, a sheriff's act of releasing an inmate is ministerial.

But Plaintiffs' argument fails for two reasons.  First, the Georgia Court of Appeals has distinguished the *provision* of medical care from the determination of *what* medical care to provide.  See Graham v. Cobb Cty., 730 S.E.2d 439, 443-44 (Ga. Ct. App. 2012).  While the initial act of providing medical care is ministerial, "the determination of *what* medical treatment to provide is an act of discretion."  Id.  Similarly, here, the act of releasing an

31

inmate may be ministerial, but the implementation and adoption of policies effectuating such a release is discretionary.  Plaintiffs attempt to simplify Defendants' acts by arguing that they merely failed to release Plaintiffs on time.  But Plaintiffs' own allegations reveal that Defendants' acts were, in reality, more complicated.  See Grammens v. Dollar, 697 S.E.2d 775, 777 (Ga. Ct. App. 2010) ("Whether the act of a public official is ministerial or discretionary is determined by the facts of each individual case, particularly the facts specifically relevant to the official's act or omission from which the alleged liability arises.") (internal citation omitted).  Plaintiffs allege that their overdetentions were caused by Defendants' "implementation and continued enforcement of procedures that required employees to depend on the operability of the GCIC system for every inmate prior to authorizing their release." (Third Am. Compl., Dkt. [9] ¶ 150.)  Plaintiffs also allege that Defendants had the authority to waive the GCIC system policy and that, on at least one occasion in November 2014, Defendants did in fact waive the policy by releasing inmates without running them through the GCIC system.  (Id. ¶¶ 39-40, 43.)  Those allegations are significant because they show that Plaintiffs' state law claims are premised on Defendants' *choices*.  In other words,

32

Defendants' allegedly wrongful acts required "the exercise of personal deliberation and judgment." <u>Golden</u>, 645 S.E.2d at 696. Those acts were, therefore, discretionary, just like a decision as to *what* medical treatment to provide.

Second, the Supreme Court of Georgia has drawn a line between statutorily mandated actions and ministerial acts. <u>See</u> <u>Murphy v. Bajjani</u>, 647 S.E.2d 54, 57 (Ga. 2007) ("[W]e disagree that statutorily-mandated action is the equivalent of a ministerial act that deprives the actor of official immunity if done negligently."). While a statute may "require[ ] that action be taken and set[ ] forth parameters for the action to be taken," the action may still lack the "hallmark of a ministerial duty" because it may not be "simple, absolute, and definite, arising from conditions admitted or proved to exist, and requiring merely the execution of a specific duty." <u>Id.</u> That is the case here. The statutes that Plaintiffs cite require that inmates are released when the time for their incarceration is up. But, once again, Plaintiffs do not allege that Defendants were negligent in performing an act that is simple or absolute. Rather, they allege that Defendants' wrongdoing came in the form of *decisions* they made about the implementation and enforcement of the GCIC system

33

policy at the Jail.  Those decisions reflect discretion and judgment.

Accordingly, Defendants are entitled to official immunity, and Plaintiffs'

individual capacity state law claims must be **DISMISSED**.

## II.    Plaintiffs' Motion to Certify Class [10]

Before Defendants removed this case from Superior Court, Plaintiffs

filed a Motion to Certify Class [10] grounded in Georgia's class action statute,

O.C.G.A. § 9-11-23.  Because the Federal Rules of Civil Procedure now govern

this case, Plaintiffs' Motion to Certify Class [10] is **DENIED with leave to re-**

**file**.  If Plaintiffs wish to file a new motion to certify class under Rule 23, they

must do so within thirty days of Defendants filing their answer.  See LR

23.1(B), NDGa ("[I]n any class action . . . in which one or more defendants

have filed a motion to dismiss . . . the plaintiff shall move for a determination

under Fed.R.Civ.P. 23(c)(1) within thirty (30) days after all defendants have

filed an answer to the complaint.").

### Conclusion

As discussed above, Defendants' Motion to Dismiss Plaintiff's Original

Complaint [3] is **DENIED as moot**, and Defendants' Motion to Dismiss

Plaintiffs' Third Amended Complaint [12] is **GRANTED in part and**

**DENIED in part** as follows:

- The motion is **GRANTED** as to Plaintiffs' official capacity § 1983 claims against Sheriff Jackson and Chief Adger, except to the extent those claims are for prospective injunctive relief.

- The motion is **DENIED** as to Plaintiffs' individual capacity § 1983 claims against Sheriff Jackson and Chief Adger.

- The motion is **GRANTED** as to all state law claims against Sheriff Jackson and Chief Adger (Count I).

- The motion is **GRANTED** as to Plaintiffs' claims against the John Doe Defendants (Counts II and IV).

Finally, Plaintiffs' Motion to Certify Class [10] is **DENIED with leave to re-file**. Defendants are **DIRECTED** to file their answer within **fourteen days** of the date of this Order.

**SO ORDERED**, this _19th_ day of May, 2017.

RICHARD W. STORY
UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/82)