**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

Oswald Thompson, Jr., et al.,

                         Plaintiffs,        Case No. 1:16-cv-04217

v.                                    Michael L. Brown
                                         United States District Judge

Sheriff Theodore Jackson and
Mark Adger,

                         Defendants.

_____/

## OPINION AND ORDER

       Before the Court is Plaintiffs' Motion to Certify Class (Dkt. 19). For the reasons below, the Court grants Plaintiffs' motion.

## I.    Background

       Since 2006, the Fulton County Jail has operated under a consent decree requiring it to release inmates within 24 hours of the time they become eligible for release. *See* Order, *Harper v. Fulton County*, No. 1:04-cv-1416 (N.D. Ga. Dec. 21, 2005), Dkt. 89 at 8. Plaintiffs in this putative class action are former inmates at the jail. They allege that Fulton County Sheriff Theodore Jackson and Fulton County Chief Jailer

Mark Adger violated their constitutional rights by detaining them in the jail after they were eligible for release.

## A. Facts

When the jail books an inmate into its custody, it runs the inmate's name through the Georgia Crime Information Center ("GCIC") database. Dkt. 9 at ¶ 37. It does this to determine whether the inmate has any warrants or law-enforcement detainers. *Id*. After receiving information that an inmate has posted bond, has had charges dropped, or is otherwise eligible for release, the jail re-runs the inmate's name through GCIC before releasing the inmate. *Id*. at ¶¶ 37, 118. If there are no active warrants, detainers, or holds, the jail releases the inmate. *Id*. at ¶ 37.

No state law, federal law, rule, or regulation requires the jail to run the GCIC check before releasing an inmate. *Id*. at ¶ 38. The Fulton County Sheriff's Office adopted this policy on its own and has the authority to waive it. *Id*. at ¶¶ 36–37, 39, 40.

Unfortunately, the GCIC system has a history of outages, some lasting days. *Id*. at ¶ 41. Defendant Adger issued a directive allowing the release of inmates during an outage only if the inmates had been booked into the jail within 48 hours of the outage or met certain other

criteria not applicable here. *Id*. at ¶ 42. Neither he nor Defendant Thompson waived the requirement for GCIC checks for all other inmates eligible for release during a GCIC outage. *Id*. at ¶¶ 44–88. Plaintiffs allege that Defendants' conduct caused the continued detention of inmates otherwise eligible for release whenever an outage occurred. *Id*. at ¶ 103. They allege that Defendants were aware of this issue and thus allowed or caused their subordinates to "overdetain" inmates when the GCIC system was not working. *Id*. at ¶ 105.

Plaintiffs claim the GCIC system became inoperable for at least ten days in November 2014. *Id*. at ¶ 35. They also allege that they — and other inmates — posted bonds or otherwise became eligible for release during that outage. *See, e.g.*, *Id*. at ¶¶ 46, 50, 55, 60, 65, 70, 74, 78, 82, 86. But, Plaintiffs allege Defendants' policy of requiring CGIC checks even during system outages caused them to be detained. *Id*. at ¶¶ 91, 95. Plaintiff Thompson, for example, alleges that police booked him into the jail for speeding on November 13, 2014. *Id*. at ¶ 45. A court issued and he posted a bond the next day, but the jail did not release him because the GCIC system was not working. *Id*. at ¶ 46. He remained in custody for more than four days until the charges were dismissed. *Id*. at ¶ 47.

He claims Defendants and their subordinates illegally detained him for 106 hours. *Id.* The other Plaintiffs allege similar facts showing that Defendants and their subordinates detained them for several days after they posted bonds or otherwise became eligible for release. *Id.* at ¶¶ 49–88.

## B.     Procedural History

Plaintiffs initially filed their claims in Fulton County Superior Court. Dkts. 1-7; 1-23. They amended their complaint twice, and Defendants removed the Third Amended Complaint to this Court. Dkts. 1-1; 1-9; 1-21.

The Court granted Defendants' motion dismissing Plaintiffs' claims against "John Doe" defendants, Plaintiffs' claims against Defendants Thompson and Adger in their official capacities, and various state-law claims. Dkt. 16. Only Plaintiffs' individual-capacity § 1983 claims against the two Defendants remain. Plaintiffs moved for class certification of those claims.

## II.    Legal Standard

A district court has broad discretion in determining whether to certify a class. *Washington v. Brown & Williamson Tobacco Corp.*, 959

F.2d 1566, 1569 (11th Cir. 1992). "Before a district court may grant a motion for class certification, a plaintiff seeking to represent a proposed class must establish that the proposed class is adequately defined and clearly ascertainable." *Little v. T-Mobile USA, Inc.*, 691 F.3d 1302, 1304 (11th Cir. 2012) (internal quotation marks omitted). A plaintiff must "then establish the four requirements listed in Federal Rule of Civil Procedure 23(a)." *Id.* That rule requires the plaintiff to show:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). "These four requirements commonly are referred to as 'the prerequisites of numerosity, commonality, typicality, and adequacy of representation,' and they are designed to limit class claims to those 'fairly encompassed' by the named plaintiffs' individual claims." *Piazza v. Ebsco Indus., Inc.*, 273 F.3d 1341, 1346 (11th Cir. 2001) (quoting *Gen. Tel. Co. of S.W. v. Falcon*, 457 U.S. 147, 156 (1982)).

Once the party seeking certification shows that the Rule 23(a) requirements have been satisfied, the party must still show that the putative class meets at least one of Rule 23(b)'s requirements. *Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1005 (11th Cir. 1997). Plaintiffs in this case allege that the proposed class satisfies Rule 23(b)(3), which provides that certification is appropriate if the "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

The party seeking class certification bears the burden of showing by a preponderance of the evidence that the proposed class meets Rule 23's requirements. *Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1233 (11th Cir. 2016). "All else being equal, the presumption is against class certification because class actions are an exception to our constitutional tradition of individual litigation." *Id.* And to determine whether class treatment is appropriate, the Court must undertake a "rigorous analysis" of the elements of Rule 23(a) and (b). *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013).

## III. Analysis

Plaintiffs seek certification of a class of:

> All persons who were inmates at the Fulton County Jail between November 13 and November 21, 2014, who were detained for more than 24 hours past the time at which employees of the Fulton County Jail knew or should have known that the inmate was to be released, and whose overdetentions were caused by the jail policy not to release inmates without running GCIC checks, even when the GCIC system was experiencing an outage.

Dkt. 19-1 at 2. For the reasons below, the Court finds that the class is ascertainable and satisfies the requirements of Rule 23(a) and Rule 23(b)(3).

### A. Ascertainability[1]

While not expressly mentioned in the rule, the Eleventh Circuit has held that the existence of an ascertainable class of persons is an implicit part of the Rule 23 analysis. *Little*, 691 F.3d at 1304. A class plaintiff, therefore, must show that the proposed class is adequately defined and

---

[1] Neither Plaintiffs nor Defendants briefed the issue of ascertainablility during initial class certification briefing. As discovery progressed, the Court became concerned that this requirement might pose an obstacle to class certification and asked for additional briefing and oral argument on ascertainablility. Dkts. 91–93. That process allayed the Court's concerns.

clearly ascertainable. *Id.* An identifiable and ascertainable class exists if its members can be identified by reference to objective criteria. *Karhu v. Vital Pharms., Inc.*, 621 F. App'x 945, 947 (11th Cir. 2015). The analysis of the objective criteria should also be administratively feasible. *Id.* "Administrative feasibility means that identifying class members is a manageable process that does not require much, if any, individual inquiry." *Bussey v. Macon Cty. Greyhound Park, Inc.*, 562 F. App'x 782, 787 (11th Cir. 2014) (internal quotation marks omitted). A plaintiff can rely upon a defendant's business records to identify class members. *Karhu*, 621 F. App'x at 948. But, in doing so, the plaintiff must "establish that the records are in fact useful for identification purposes, and that identification will be administratively feasible." *Id.*

Plaintiffs have shown that the proposed class is sufficiently ascertainable. First, Plaintiffs have pointed to objective criteria by which to identify class members. The objective criteria are whether an inmate was detained in the jail (during the relevant time) for more than 24 hours after the inmate became eligible for release. Those who meet these criteria are in the class. Those who do not are out. Second, Plaintiffs have shown an administratively feasible basis for identifying

membership in the class. Plaintiffs propose a two-step process: (1) "identify any inmate released more than 24 hours after the jail received notice that the inmate was eligible for release during the GCIC outage," and (2) "remove any inmate from the list whose release was not delayed by the GCIC outage." Dkt. 93 at 3.

Finally, Plaintiffs have shown that they can reliably identify class members by using the jail's own records. Plaintiffs deposed Felecia Ivey, who has worked at the Fulton Sheriff's Office for twenty-five years, is the jail's current Criminal Information Systems Supervisor, and was a Records and Document Specialist. Dkt. 93-7 at 11–13. She has extensive knowledge of and involvement in the jail's process for releasing inmates, was involved in the process in 2014, and helped train other employees in how to process inmates for release. *Id.* at 16–18, 25. She explained that, when a court enters an order granting bond, sentencing a defendant to time served, or otherwise ordering an inmate's release, a "release-triggering document" is sent to a records and document specialist at the jail. Dkt. 93-7 at 39. The document indicates the time and date that the inmate became eligible for release. *Id.*

If an inmate posts a bond, for example, the bonding officer delivers a "Bond Release Verification" document to the jail's records department. The document includes a time stamp indicating when the inmate posted the bond. *Id.* at 20–23. If a court orders a signature bond or bond that does not require any payment or orders an inmate released for time already served, the judge's order comes back to the jail either physically or via fax. *Id.* at 24–27, 31–34. If received via fax, it contains a time-and-date stamp indicating when the jail received it. *Id.* If the document is delivered to the jail with no such stamp, the jail employee stamps the date and time the document was received. *Id.* at 23. In either event, the release-triggering document contains a notation as to when the jail learned that the inmate should be released. The jail keeps these documents. *Id.*

For each inmate, the jail also creates and maintains a document called a "1-Card." *Id.* at 36. Upon receipt of a release-triggering document, the jail employee makes a handwritten note on the inmate's 1-Card to document the time that the jail became aware that the inmate

was eligible for release. *Id.* at 37–40.[2] Arguably the time stamp and the 1-Card notation should be the same or close to the same. The jail implemented the use of time stamps and notations on 1-Cards to comply with the Harper consent decree. *Id.* at 80–82.

The jail also has a computer system known as Odyssey. When the jail employee receives a release-triggering document, the employee is supposed to update the inmate's Odyssey profile to indicate the inmate's eligibility for release. *Id.* at 40–41. The entry includes an electronic time signature that provides further information as to when the jail learned an inmate was eligible for release. *Id.*

---

[2] The release triggering process can be slightly different in some situations. Individuals arrested for the non-payment of child support, for example, become eligible for release once they pay the amount owed. Dkt. 93-7 at 43–44. They do so at the bonding window which provides a "purge paid" notification. That notification is sent to the jail as the release notification, just as any other bond. *Id.* Similarly, if a court orders someone (typically a parent) to co-sign an inmate's bond, the inmate is ineligible for release until the co-signer does so. *Id.* at 45–46. The co-signer signs the bond at the pretrial services office, which then faxes a document confirming the signature (and eligibility for release) to the jail. *Id.* These processes result in the jail receiving a document setting forth the time and date the inmate became eligible for release. *Id.* The jail employee uses this information to update the inmates' 1-Cards. *Id.* at 46.

The Harper consent decree also required the jail to report the number of inmates released more than twenty-four hours after it received notice that the inmate was eligible for release.  Dkts. 1-25 at 167–71; 19-3; 93-10 at 4.  To comply with this process, the jail created a spreadsheet that tracks eligibility and release information.  Dkt. 93-3.

Initially, Plaintiffs believed that the Harper spreadsheet would be sufficient to identify inmates during the relevant time who were detained more than twenty-four hours after becoming eligible for release.  Dkt. 93 at 3.   From this list, Plaintiffs proposed to simply remove those inmates who had some other hold or legal process that prevented his or her release.  *Id.* at 5.  Plaintiffs' analysis, however, discovered that, while the spreadsheet accurately tracks the date and time an inmate is released, the spreadsheet does not accurately track the time at which the jail learned an inmate became eligible for release.  *Id.*

To remedy this, Plaintiffs proposed to use the 1-Cards on which the document specialist noted the time and date the jail learned the inmate was eligible for release.   *Id.*  Plaintiffs then learned that this was not always possible as some 1-Cards were missing, had no such notation, or had illegible handwriting.   *Id.* at 9.   As a result, Plaintiffs used a

combination of 1-Cards, the time-stamped release triggering documents, and electronic time signature in the Odyssey system to determine when each inmate became eligible for release. *Id.* at 6. By comparing the accurate release information in the Harper spreadsheet with the release eligibility information from these three other sources, Plaintiffs were able to identify inmates detained for more than twenty-four hours after they became eligible for release during the relevant time period. *Id.* at 3–8. Within this group, Plaintiffs then excluded inmates whose release was not delayed by the GCIC outage but rather by a foreign hold or other legal impediment that prevented release. *Id.* at 8–13.

Plaintiffs' proposed process is administratively feasible. It is easily manageable, involves little inquiry, and relies upon objective criteria. It includes a review of the jail's own files, an objective comparison of release eligibility data and actual release data, and the exclusion of inmates held for other reasons. While the process does require some individual review of inmate files, that is insufficient to prevent class certification, particularly given the cursory review required of each file simply to identify the time the jail learned the inmate was eligible for release and the existence of any other hold preventing the release. *Owens v.*

*Metropolitan Life Ins. Co.*, 323 F.R.D. 411, 416 (N.D. Ga. 2017) ("[Administrative feasibility] does not mean 'that *no* level of inquiry as to the identity of class members can ever be undertaken. If that were the case, no Rule 23(b)(3) class could ever be certified.'") (quoting *Byrd v. Aaron's Inc.*, 784 F.3d 154, 171 (3d Cir. 2015)). Indeed, the Eleventh Circuit has held that a plaintiff can use a defendant's records to satisfy the ascertainability standard if the plaintiff "also establish[es] that the records are in fact useful for identification purposes, and that identification will be administratively feasible." *Karhu*, 621 F. App'x at 947. This fact supports the conclusion that some level of individual review is acceptable.

The parties' efforts in this matter also validate the objective nature and administrative feasibility of Plaintiffs' method for identifying proposed class members. Plaintiffs used the jail's own records to identify a group of inmates who, during the relevant time period, were detained for more than 24 hours after the jail learned they were eligible for release. Plaintiffs then excluded from the list all inmates whose overdetentions were not caused by the GCIC outage — that is, inmates who had other

holds or circumstances that prevented their release apart from the GCIC outage. This two-step process identified 288 inmates. Dkt. 93 at 8.

Plaintiffs sent this list to Defendants as part of a request for admission. Defendants confirmed Plaintiffs' assessment as to 256 of those inmates, and provided reasoning for why Defendants disagreed with the inclusion of thirty-two inmates. Dkts. 93 at 8; 93-1; 93-11. Upon further assessment, Plaintiffs agreed that they had misinterpreted file notations for eleven of those inmates and dropped them from the proposed class.[3] Dkt. 93 at 8–9. Plaintiffs corrected typos or simple mistakes that Defendants noted for three others and left them in the proposed class.[4] *Id.*

---

[3] One of the inmates Plaintiffs dropped from the class because of their discussion with Defendants was Darrion Tripp, a named plaintiff. Dkt. 93 at 12. A review of Plaintiffs' final proposed class list also indicates that Plaintiffs concluded named Plaintiffs Daeja Mitchell and Tommie Douglas are not actually members of the class. Dkt. 93-2. The Court's consideration of the motion for class certification is not based upon their continued participation as class representatives.

[4] More recently, Plaintiffs analyzed release data available in the Odyssey system information for inmates whose files were missing or did not contain time stamps. Dkt. 93-1. Plaintiffs identified thirty-six additional class members through this process. Defendants have not yet reviewed this list to confirm or challenge Plaintiffs' assessment. Regardless, the evidence shows that Plaintiffs have established a manner of using Defendants' records to identify class members and shows that the records provide objective criteria to administratively identify member of the

The parties continue to dispute whether eighteen inmates should be included in the proposed class.  *Id.* at 9.  Their dispute does not challenge Plaintiffs' overall methodology for satisfying acsertainability. It primarily arises from disagreements as to the adequacy of file notations.  The files for eight of these eighteen inmates, for example, contained no time stamp or written notation indicating when the jail learned that the inmates were eligible for release.[5]  *Id.* at 17.  But, these inmates each received a bond or other order of release during a hearing at the jail.  *Id.*  Such a hearing typically involves several inmates on the same calendar.  *Id.*  A jail employee testified at deposition that a records operator in the courtroom during the hearing is supposed to make handwritten notes on the hearing calendar by each inmate's name to document the order of release pertaining to that inmate.  Dkt. 93-7 at 114–15.  The records operator then provides the notated calendar to the document specialist who stamps the time of receipt on it and updates the

_____

class.  Plaintiffs have provided a spreadsheet that lists 313 class members identified through Defendants' records.  The list includes 259 upon which there was agreement, thirty-six identified through Odyssey but not yet confirmed by Defendants, and eighteen that are still in dispute (and that are discussed herein).
[5] Apparently, the jail failed to record this information as required by its internal procedures.

inmates' 1-Cards with the release information. *Id.* The jail employee testified that the records and document specialist would receive all the release orders for inmates included in a hearing at the same time. *Id.* at 32, 113–15.

For the eight inmates with files containing no time stamp or handwritten notation, Plaintiffs reviewed time stamp information on calendars in files for other inmates who had hearings at the same time as these eight inmates. *Id.* at 17. Plaintiffs contend that — based on the jail employee's undisputed testimony — these records provide evidence as to when the jail received notice that these eight inmates were eligible for release. *Id.*

By way of example, the jail's file for inmate Alfred Clemmons indicates that, during a 1:00 p.m. hearing on November 17, 2014, Judge Portis ordered Mr. Clemmons released with credit for time served. Dkt. 93-13 at 8–10. The file contains no time stamp or handwritten notation indicating when the jail employees responsible for processing his release learned of the court's order. *Id.* The copy of the 1:00 p.m. calendar in Mr. Clemmons's file contains a stamp, but it is too faint to read. *Id.* at 10. Plaintiffs have established, however, that inmates Titus Jackson,

Vincent Price, Hussaine Clark, and Jason Dawson were also on Judge Portis's 1:00 p.m. calendar on November 17, 2014. *Id.* at 13, 15, 18. Their 1-Cards all have handwritten notes indicating that the jail learned they were cleared for release at 2:06 p.m. on that day. *Id.* Given the jail employee's testimony that the document specialist receives notification of all inmates on a calendar at the same time, Plaintiffs' argue that the evidence in the other files establish that the jail also received notice of Mr. Clemmons's eligibility for release at 2:06 p.m. on that day. *Id.* at 18. Plaintiffs offer a similar analysis for the other seven inmate files. The undisputed facts provide sufficient grounds to determine the release dates for these inmates and demonstrate that ascertaining their inclusion in the class is based on objective criteria and is administratively feasible.

Plaintiffs and Defendants also disagree as to the impact of notations concerning medical holds and requests for pre-release interviews. Files for two of the remaining ten files in dispute contain a reference to a "medical hold." *Id.* at 18–19. Defendants apparently argue that these inmates were detained after they became eligible for release because they were receiving medical treatment, not because of the GCIC

outage. *Id.* at 19. If true, this would take them out of the class. Plaintiffs note, however, that both inmates were released — not from the medical cell — but rather from a general population cell. Dkt. 93-13 at 43–44, 49–50. Indeed, the inmate file for one indicates that he was medically cleared about one month before his release. *Id.* at 38. As a result, it appears that the medical holds are irrelevant to the release determination.

Similarly, the files for three other inmates (including named Plaintiff Sterling Palmer) indicate that their bond orders required an interview by pretrial release services before they could be released. *Id.* at 121. Defendants argue that these inmates cannot be part of the class as their overdetention was caused by the interview requirement, not the GCIC outage. Dkts. 93 at 13; 91 at 7. But, a jail employee testified that the prelease interviews are scheduled only after the jail runs the GCIC check. Dkt. 93-7 at 121. As a result, the GCIC outage prevented the processing of these Plaintiffs' releases, including the scheduling of their interviews.

Finally, Plaintiffs and Defendants dispute whether the remaining five inmate files contain the necessary documents to identify the release

data.  This dispute appears to arise from communication errors — that is, poor communication as to which documents they are examining and where to locate the data rather than the absence of data.  Dkt. 93 at 21 (cataloguing the disagreement as to operative pages in five files).  But again, this disagreement does not undermine the overarching conclusion — that the operative class is adequately defined by objective criteria and that there is an administratively feasible method for analyzing that criteria and determining membership.

Based on Plaintiffs' rigorous efforts thus far and a review of the undisputed evidence, the Court is satisfied that members of the proposed class can be identified by reference to objective criteria and an administratively feasible process.  In other words, the proposed class is "adequately defined and clearly ascertainable." *Little*, 691 F.3d at 1304.

## B.  Numerosity

To satisfy Rule 23(a)'s numerosity requirement, the class must be "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  The Eleventh Circuit has held that "[w]hile there is no fixed numerosity rule, generally less than twenty-one is inadequate, more than forty [is] adequate, with numbers varying according to other factors."

*Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986) (internal quotation marks omitted).

Plaintiffs initially argued that the proposed class satisfies the numerosity requirement because the class is as large as 108 inmates. Dkt. 19-1 at 8.  As explained above, Plaintiffs and Defendants have now agreed that the proposed class includes at least 256 inmates, with Plaintiffs claiming even more.  Defendants, therefore, concede numerosity, and the Court agrees.  Dkt. 26 at 8.  Because joinder of 256 or more class members would be impracticable under the circumstances presented here, Plaintiffs have satisfied the numerosity requirement of Rule 23(a)(1).

## C.    Commonality

Rule 23(a)(2) requires that Plaintiffs show "questions of law or fact common to the class."  Every issue of law or fact need not be the same for each class member.  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011) ("[F]or purposes of Rule 23(a)(2)[,] even a single common question will do[.]") (internal quotation marks omitted).  Instead, a plaintiff must point to a "single common question" that is "capable of classwide resolution — which means that determination of its truth or falsity will

resolve an issue that is central to the validity of each one of the claims in one stroke." *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 984 (11th Cir. 2016) (quoting *Wal-Mart Stores, Inc.*, 564 U.S. at 350) .

Plaintiffs have correctly identified several common questions. Whether Defendants had a policy that required GCIC checks to be run before releasing an inmate is a common question of fact. Whether Defendants required adherence to that policy (in whole or in part) during a GCIC outage is a common question. Other common questions include whether there was a GCIC outage in November 2014; whether Defendants knew this outage and their policy of requiring GCIC checks would cause inmates otherwise eligible for release to be incarcerated; whether this alleged practice violated the Constitution; and whether Defendants are liable under § 1983 for their supervisory role in failing to release inmates who were legally eligible for release. Each proposed class member's claim will require an answer to these questions.

Despite these common questions, Defendants contend that commonality does not exist. They argue that whether an inmate was unconstitutionally detained depends on whether the continuing detention was "reasonable as it relates to that particular inmate[.]" Dkt.

26 at 9. Defendants also contend that reasonableness "has the potential to produce dissimilar results in a case where inmates had different criminal backgrounds, were housed for different periods of time, and had disparate charges." *Id.* at 10.

But Plaintiffs do not claim that their overdetentions were unreasonable given their particularized (or individual) circumstances, so that each class member's circumstances become relevant. Instead, Plaintiffs allege that they were all intentionally detained for the same reason and by the same event: Defendants' decision to detain inmates eligible for release during the November 2014 outage simply because they wanted to run GCIC checks, and the GCIC system was down. The Eleventh Circuit has recognized "[t]he constitutional right to be free from continued detention after it was or should have been known that the detainee was entitled to release. . . ." *Cannon v. Macon Cty.*, 1 F.3d 1558, 1563 (11th Cir. 1993). This right exists for an inmate who is eligible for release regardless of the individual inmate's criminal background, nature of the current charges, or duration of incarceration. Those individual facts may be relevant to a bond determination. But, once bond is granted and posted, those considerations are irrelevant. Put another way, once a

judge decides that an inmate is eligible for release (and any conditions, such as the posting of a bond, are met), the jail is obligated to release that inmate without any "reasonableness" determination by the jail.

Here, Plaintiffs have alleged that Defendants intentionally detained them and others after their scheduled releases in violation of the Fourth, Eighth, and Fourteenth Amendments. Because the same practice and policy allegedly injured Plaintiffs, the causation elements of their § 1983 claims are common to all Plaintiffs. The Court finds that Plaintiffs have satisfied Rule 23(a)'s commonality requirement.

## D.    Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class." The class representative's claims are typical if "the claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory." *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984). In other words, "[a] class representative must possess the same interest and suffer the same injury as the class members in order to be typical under Rule 23(a)(3)." *Murray v. Auslander*, 244 F.3d 807, 811 (11th Cir. 2001).

The typicality requirement can be satisfied even if factual distinctions exist between the claims of the class representatives and the other class members. "[A] strong similarity of legal theories will satisfy the typicality requirement despite substantial factual differences." *Appleyard v. Wallace,* 754 F.2d 955, 958 (11th Cir. 1985); *see also Murray*, 244 F.3d at 811 ("The typicality requirement may be satisfied despite substantial factual differences, however, when there is a strong similarity of legal theories.") (internal quotation marks omitted). The Eleventh Circuit has explained that typicality "does not require identical claims or defenses. A factual variation will not render a class representative's claim atypical unless the factual position of the representative markedly differs from that of other members of the class." *Kornberg*, 741 F.2d at 1337.

Plaintiffs seek to represent a class of people who were overdetained between November 13 and November 21, 2014, during and because of the GCIC outage and Defendants' GCIC policies. Dkt. 19-1 at 2. Plaintiffs have also alleged that they suffered the same injury. Plaintiff Oswald Thompson, for example, alleges that he received and posted a bond on November 14, 2014 — thus becoming eligible for release on that day.

Dkt. 9 at ¶¶ 45–46. He also alleges that Defendants caused his detention for another four days because the GCIC system was out. *Id.* at ¶ 47. Each of the other Plaintiffs includes similar allegations. Their claims certainly arise from the same course of conduct as the other class members. They also advance the same legal theory — that Defendants' conduct violated their Fourth, Eighth, and Fourteenth Amendment rights. *See* Dkt. 9.

Defendants still contend that typicality fails because, while named Plaintiffs allege that they were overdetained for three or more days, most other class members were released within 48 hours of the time they became eligible for release. This contrast is merely a difference in the extent of the constitutional violation — or perhaps one way in measuring the alleged constitutional violation. Despite the varying lengths of time each Plaintiff was overdetained, they and the other class members are pursuing the same legal theory based on the same conduct. They all allege that Defendants violated their constitutional rights during the same eight-day period by detaining them after they were eligible for release because of the GCIC system outage and Defendants' policy of holding inmates pending a GCIC check. The factual difference in the

length of the detention cannot render Plaintiffs atypical of the class. The Court is satisfied that Plaintiffs' claims typify those of the class as a whole. Plaintiffs have thus satisfied the typicality requirement of Rule 23(a)(3).

### E.    Adequacy

Rule 23(a)(4) requires that that the class representatives show that they have "common interests with unnamed class members and will vigorously prosecute the interests of the class through qualified counsel." *Piazza*, 273 F.3d at 1346. "This adequacy of representation analysis encompasses two separate inquiries: (1) whether any substantial conflicts of interest exist between the representatives and the class; and (2) whether the representatives will adequately prosecute the action." *Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003) (internal quotation marks omitted). "If substantial conflicts of interest are determined to exist among a class, class certification is inappropriate." *Id*.

Defendants concede that no substantial conflicts of interest exist between the representatives and the class. Dkt. 26 at 12. The Court agrees. Defendants, however, challenge the qualifications of Plaintiffs'

counsel to prosecute this action. Essentially, Defendants argue that they can find no evidence that one of Plaintiffs' lawyers has litigated in federal court and that the other, while he has significant litigation experience, "has not handled a class action as lead counsel from start to finish." *Id.* at 14. To establish adequacy of representation, class counsel must be qualified, experienced, and generally able to conduct the litigation. *Griffin v. Carlin*, 755 F.2d 1516, 1533 (11th Cir. 1985). And, "[a]bsent specific proof to the contrary, the adequacy of class counsel is presumed." *Justice v. Rheem Mfg. Co.*, 318 F.R.D. 687, 695 (S.D. Fla. 2016) (citing *In re Seitel, Inc. Securities*, 245 F.R.D. 263, 271 (S.D. Tex. 2007)).

Plaintiffs' counsel submitted affidavits establishing their litigation experience in civil-rights actions and claims against the government. *See* Dkts. 31-1; 31-2; 31-3. Ms. Stern has handled many criminal jury trials, argued appeals to the Eleventh Circuit, been involved in civil-rights lawsuits, and run her own law firm for the past five years. Dkt. 31-2. Mr. Begnaud has been practicing for more than ten years, worked at a well-respected law firm, served as a public defender where he tried many cases, and (since opening his own firm) has litigated at least thirty civil-rights cases in federal court, many of which involved prisoner claims.

Dkt. 31-1. His partner, Mr. Horsley, has similar experience as a public defender and has represented plaintiffs in more than twenty civil-rights cases in federal court. Dkt. 31-3. The Court has also reviewed counsels' conduct here, including their briefs and arguments at hearings. The Court finds — with no doubt whatsoever — that Plaintiffs' counsel is qualified to litigate this action on behalf of the class. *See Campos v. ChoicePoint, Inc.*, 237 F.R.D. 478, 487 (N.D. Ga. 2006) ("The Court's review of the parties' pleadings and the argument of counsel at the Hearing indicates to the Court that adequacy of counsel is not an issue here."). Plaintiffs have satisfied Rule 23(a)(4)'s adequacy requirement.

## F.     Rule 23(b)(3) Predominance

In addition to satisfying the Rule 23(a) requirements, Plaintiffs must also satisfy at least one of Rule 23(b)'s requirements. *Jackson*, 130 F.3d at 1005. Plaintiffs contend that the proposed class satisfies Rule 23(b)(3), which requires that the Court "find[] that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

"To determine whether the requirement of predominance is satisfied, a district court must first identify the parties' claims and defenses and their elements." *Brown*, 817 F.3d at 1234. Then, the Court must "classify [those] issues as common questions or individual questions. . . ." *Id.* If a question is common to the class, "the same evidence will suffice for each member." *Id.* (quoting *Blades v. Monsanto Co.*, 400 F.3d 562, 566 (8th Cir.2005)). If the evidence will "var[y] from member to member," the question is individual. *Id.* And "[a]fter identifying the common and individual questions, the district court should determine whether the common questions predominate over the individual ones." *Id.* at 1234–35.

But the Eleventh Circuit has held that predominance requires a qualitative assessment too; it is not "bean counting," and the "'relative importance' of the common versus individual questions also matters." *Id.* at 1235 (quoting *Butler v. Sears, Roebuck and Co.*, 727 F.3d 796, 801 (7th Cir. 2013); *see also Rutstein v. Avis Rent-A-Car Sys., Inc.,* 211 F.3d 1228, 1234 (11th Cir. 2000) (explaining that predominance "can only be determined after considering what value the resolution of the class-wide issue will have in each class member's underlying cause of action"). A

court, therefore, should assess predominance with its overarching purpose in mind: ensuring that "a class action would achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997) (quoting Advisory Committee's Notes on 1966 amendment to Fed. R. Civ. P. 23).

In the Court's order on Defendants' motion to dismiss, the Court set forth the elements of Plaintiffs' claim. Dkt. 16. In that order, the Court recognized the well-settled "constitutional right to be free from continued detention after it was or should have been known that the detainee was entitled to release." *Id*. at 16 (quoting *Cannon*, 1 F.3d at 1563). To show a violation of this right, Plaintiffs must show "common law false imprisonment and a due process violation under the Fourteenth Amendment." *Id*. at 17 (quoting *Campbell v. Johnson*, 586 F.3d 835, 840 (11th Cir. 2009)). False imprisonment requires proof of "an intent to confine, an act resulting in confinement, and the victim's awareness of confinement." *Id*. And to show a due process violation, Plaintiffs must show that Defendants' subordinates "acted with deliberate indifference

to Plaintiffs' due process rights." *Id.* (quoting *West v. Tillman*, 496 F.3d 1321, 1327 (11th Cir. 2007)). As the Court recognized, proof that "Defendants' subordinates knew that Plaintiffs were due for release[ ]but continued to detain them anyway" would suffice to show deliberate indifference in this context. Dkt. 16 at 18. Finally, because Defendants are supervisory officials, Plaintiffs must show that Defendants "personally participate[d] in the unconstitutional conduct or there is a causal connection between such conduct and the defendant's actions." *Id.* at 20 (quoting *Harper v. Lawrence Cty.*, 592 F.3d 1227, 1236 (11th Cir. 2010)).

All the class members were injured by the same event — Defendants' refusal to release inmates otherwise eligible for release during the eight-day GCIC outage in November 2014. Dkt. 19-1 at 2. And Plaintiffs allege that Defendants violated their constitutional rights in the same way, with a common course of conduct and intent. *Id.* Whether there was an intent to confine and an act of confinement will be susceptible to class-wide proof. This will include evidence that Defendants required GCIC searches before releasing inmates, were aware of the outage on November 2014, and knew the combination of the

outage and their policy would result in the overdetention of some inmates.

The same proof will also be relevant to deliberate indifference — that is, whether the evidence shows Defendants' subordinates were aware Plaintiffs were due for release but continued to detain them anyway. Finally, Defendants' supervisory responsibility is a common question that will depend on these same core — and common — facts.

Admittedly, this matter involves some individualized proof, most notably showing that each class member was legally eligible for release during the relevant time but detained because of the outage and that Defendants' subordinates were aware the class members were eligible for release. But, as explained above, the jail's own records provide a relatively simple process for making this determination. Individual issues will not overwhelm the common issues presented by Plaintiffs' allegations.

At bottom, common questions predominate over individualized questions here because Plaintiffs identify a specific policy enacted by Defendants that caused their overdetentions during the GCIC outages in

November 2014. Defendants' common policy is the glue that holds these claims together.

In *Driver v. Marion Cty. Sheriff*, 859 F.3d 489 (7th Cir. 2017), a group of inmates sued the Marion County Jail claiming the sheriff implemented release practices and procedures that caused their continued detention after they became eligible for release. The Seventh Circuit reversed the denial of class certification, holding that class treatment was appropriate because Plaintiffs pointed to a specific "policy or practice [that] caused them to be detained for an unconstitutionally-unreasonable length of time." *Id*. at 492 (reversing denial of inmate overdetention class-certification motion). In doing so, the court distinguished cases in which inmates merely alleged an unreasonable delay in their release without pointing to a common policy that intentionally caused the delay. *Id*. Here, Plaintiffs identify that policy and, as a result, common questions predominate.

Defendants argue, however, that "the pertinent question is if each purported class member was overdetained or if the inmates' continued detention was a reasonable incident to administrative release. . . ." Dkt. 26 at 15. Defendants correctly recognize that once eligible for release,

the jail must release an inmate within a reasonable time, and that reasonableness considers the necessary administrative procedures incident to release. *See Powell v. Barrett*, 376 F. Supp. 2d 1340, 1350-51 (N.D. Ga. 2005), *rev'd on other grounds*, 246 F. App'x 615 (11th Cir. 2007). Because the time for reasonable administrative procedures may vary from inmate to inmate, Defendants argue, class certification is inappropriate. Dkt. 26 at 15.

Defendants, however, ignore Plaintiffs' core allegation that Defendants refused to release them — not because of the administrative process — but because they adopted a policy of deliberately detaining people eligible for release during GCIC outages. A jail supervisor may not knowingly detain someone past the point at which he or she knows the person is eligible for release. The liability of Defendants here, therefore, turns on whether they adopted an unconstitutional policy that caused the overdetention, not administrative delays. There is no reason to believe that an assessment of the reasonableness of administrative delays apart from the decision to wait for the GCIC check will be any part of this matter.

Defendants also argue that because Defendants allegedly overdetained all class members for different amounts of time, and factors other than the length of the overdetention may be relevant in a damages calculation, individualized damages defeat predominance. But every circuit has recognized the "black letter rule" that that "individual damage calculations generally do not defeat a finding that common issues predominate." *Brown*, 817 F.3d at 1239 (citation omitted). "[I]ndividual damages defeat predominance if computing them "will be so complex, fact-specific, and difficult that the burden on the court system would be simply intolerable." *Id*. at 1240. Moreover, "[d]istrict courts have many tools to decide individual damages: (1) bifurcating liability trials and damage trials with the same or different juries; (2) appointing a magistrate judge or special master to preside over individual damage proceedings; (3) decertifying the class after the liability trial and providing notice to class members concerning how they may proceed to prove damages; (4) creating subclasses; or (5) altering or amending the class." *Id*. at 1239 (internal quotations and citations omitted).

Plaintiffs have proposed "setting a fixed amount of damages for each class member for each claim according to a matrix or schedule." Dkt.

31 at 15. Although this might minimize individual damages questions, it may not adequately account for each class member's damages. The Court does not believe Plaintiffs can simply conjure up a rule to avoid the potential difficulties in quantifying each class member's damages. But the Court also does not believe that this is such a rare case that individualized damages assessments defeat predominance. *See Klay v. Humana*, 382 F.3d 1241, 1260 (11th Cir. 2004) (noting that cases in which individualized damages assessments preclude class certification "rarely, if ever, come along."). At this stage, the Court finds that the tools available to it in determining class members' damages would be adequate to calculate individual class member's damages. The Court also finds that calculating damages here would not be so "difficult that the burden on the court system would be simply intolerable." *Id*. Although the Court reserves ruling on the proper measure for calculating damages, it is satisfied individualized damages assessments do not defeat predominance here. *See Jones v. Murphy*, 256 F.R.D. 519, 526 (D. Md. 2009) (same).

Finally, the Court finds that under these circumstances, "a class action is superior to other available methods for fairly and efficiently

adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The class members' claims here likely involve relatively small damages amounts. And it is unlikely that class members would pursue these claims on their own. The Court thus finds that the class action mechanism provides the most efficient method of resolving Plaintiffs' claims here. *See Bynum v. District of Columbia*, 214 F.R.D. 27, 40 (D.D.C. 2003) (finding superiority where "individual class members . . . were allegedly overdetained for relatively short periods [and] may stand to recover only a small amount of damages.").

## IV. Conclusion

For the foregoing reasons, the Court **GRANTS** Plaintiffs' Motion to Certify Class (Dkt. 19).

**SO ORDERED** this 15th day of November, 2018.

_____
MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE