## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

Oswald Thompson, Jr.,
individually and on behalf of all
others similarly situated, et al.,

                    Plaintiffs,

v.

Sheriff Theodore Jackson and
Chief Mark Adger,

                    Defendants.

_____/

Case No. 1:16-cv-04217

Michael L. Brown
United States District Judge

## <u>ORDER</u>

A statewide law enforcement database went down for over a week in November 2014.  During that time, the Fulton County Jail did not release some inmates even though they were already eligible for release.  Plaintiffs are those inmates.  They sued Defendants Fulton County Sheriff Theodore Jackson and Fulton County Chief Jailer Mark Adger, claiming they illegally detained them.  Defendants moved for summary judgment.  (Dkt. 109.)  The Court grants Defendants' motion in part and denies it in part.

## I.    Background

Since 2006, the Fulton County Jail has operated under a consent decree requiring it to release inmates within twenty-four hours of the time they become eligible for release.  (Dkt. 116-1 ¶ 1.)  When a jail employee books an inmate into custody, the employee runs the inmate's name through two computer databases — Odyssey and the Georgia Crime Information Center ("GCIC") — to determine whether the inmate has any other active warrants or law-enforcement detainers.  (*Id.* ¶ 16.)  After receiving information that an inmate has posted bond, has had charges dropped, or is otherwise eligible for release, a jail employee re-runs the inmate's name through the two databases.  (*Id.* ¶¶ 14, 20.)  They do this to confirm no new warrants or detainers were filed against the inmate since the initial check.  (*Id.* ¶ 15.)  If none, the jail releases the inmate.  (*Id.* ¶¶ 17–18.)  The release process typically takes five to eight hours.  (Dkt. 112-1 ¶ 19.)  Plaintiffs do not challenge the jail's process of running Odyssey and GCIC checks before releasing inmates — that is, when the system was operational.

Unfortunately, the GCIC system has a history of outages, some lasting days.  (Dkt. 1-25 at 86:8–93:14.)  When an outage occurred, the

jail did not suspend the pre-release GCIC check but rather stopped releasing inmates until the system came back on. (Dkt. 116-1 ¶¶ 33–36.) A jail employee responsible for releasing inmates explained that, during such an outage, the jail continued to receive word that inmates were eligible for release. (Dkt. 93-7 at 68:22-69:16, 70:7–13.) They ran the names of those inmates through the Odyssey system to look for outstanding warrants or holds. (*Id.* at 68:22-69:16.) Even if that system showed no reason to hold an inmate, the jail employee stopped processing the inmate's release, placed his or her file back in the "clear-for-release" basket, and waited for the GCIC system to come back on-line. (*Id.* at 70:9-72:3; Dkt. 116-1 ¶ 35.) In other words, the jail employee would stop or suspend the release process until GCIC began working again.

Defendant Adger, the Jail Commander, was aware of this issue. After the first prolonged outage, he issued a directive allowing the release of an inmate during an outage only if the inmate had been booked into the jail within eight hours of the outage or met certain other criteria not applicable here. (Dkt. 116-1 ¶ 38.) Otherwise, he directed employees not to release an inmate until GCIC began working again and they could run the inmate's name through that database. (*Id.* ¶ 48.)

In 2013 and 2014, there were four significant GCIC outages. (Dkt. 1-25 at 86:8–93:14.) The first outage happened around November 2013. (*Id.* at 87:16–88:13.) It lasted between one and two days, causing the jail to detain between twenty and thirty inmates for longer than the time it would have taken to process their releases. (*Id.*) The second outage happened in 2014, lasted between three and three-and-a-half days, and caused the jail to continue detaining between thirty and forty inmates who had become eligible for release. (*Id.* at 88:14–89:5.) The third outage also happened in 2014. It lasted between two to three days, causing the jail to continue detaining twenty to thirty inmates for longer than the time it should have taken to process their releases. (*Id.* at 89:6–16.) In each instance, the jail held some inmates for more than twenty-four hours after they had become eligible for release. (*Id.* at 90:15–21.)

Defendant Adger typically learned about an outage within twelve hours. (Dkt. 116-1 ¶ 29.) He then informed the Chief Deputy who informed Defendant Jackson. (*Id.*) Defendant Jackson was usually informed within a day or two of a GCIC outage. (Dkt. 112-14 at 9:2–5.)

On Friday, November 14, 2014, the GCIC system went down again. (Dkt. 112-4.) This malfunction occurred on a statewide basis. (Dkt. 109-

2 ¶ 15.)  Defendants were not at fault.  (*Id.*)  At the time, the jail was operating under the policy that inmates would not be released until GCIC checks could be conducted.  (Dkt. 112-7.)  The Odyssey system kept working during this time and jail officials ran the names of inmates eligible for release through that system.  (Dkt. 112-5.)  This data now provides information to identify inmates who were eligible for release but detained as a result of the GCIC outage and the jail's policy.  (Dkt. 93-7 at 71:2–72:3.)  On Friday, November 14, 2014, jail officials ran the names of forty-nine inmates through Odyssey but not GCIC.  (Dkt. 112-5.)  By Monday, the number had increased to ninety-six inmates.  (Dkt. 112-8.)  The jail was ready to release each of those inmates pending GCIC confirmation that the inmate had no outstanding warrant or detainer.  (Dkt. 112-5.)  Of course, the Odyssey check had already confirmed the lack of warrants or holds in its database.  (Dkt. 93-7 at 72:4-16.)

Defendant Adger received an email on the morning of Friday, November 14, 2014 telling him the GCIC system was down.  (Dkt. 112-4.)  Defendant Jackson also found out about the outage while it was happening but does not recall exactly when.  (Dkt. 112-14 at 9:12–21.)  If Defendant Jackson had given his approval, Defendant Adger could have

released inmates without running their names through GCIC. (Dkts. 1-25 at 119:15–18; 112-14 at 11:6–15.) Indeed, Defendant Adger testified that he had the unilateral authority to suspend the need for the GCIC check and release inmates during the outage. (Dkt. 1-25 at 119:15–18.)[1] In other words, no law required the jail to run inmates through GCIC before releasing them. The jail had the ability to waive its internal requirement in order to prevent the prolonged detention of inmates who were entitled to be released. Defendants decided not to do so.

On Sunday, November 16, Defendant Jackson forwarded an email to Defendant Adger. (Dkt. 112-6.) The email was written by the "loved one" of an inmate eligible for release. The author complained that, despite posting a property bond, she had been told her loved one would not be released because the GCIC system was down. (*Id.*) She further explained her loved one was not getting necessary mental health treatment because the jail was holding him. (*Id.*) That day, Defendant

---

[1] Defendants contend Defendant Adger did not have the authority to release inmates without running GCIC checks. (Dkt. 116-1 ¶ 49.) They say he needed Defendant Jackson's authorization. But, Defendant Adger clearly testified that he did. There appears to be a dispute between Defendant Adger and Defendant Jackson as to the extent of Defendant Adger's authority. Viewing the evidence in the light most favorable to Plaintiff, he had that authority. It is at least a jury question.

Adger informed a deputy that the jail was releasing few inmates because "GCIC has been out for a solid day." (Dkt. 112-7.) The GCIC system did not become fully operational until Friday, November 21, 2014. (Dkt. 114-6 at 95:7–18.)

Plaintiffs are former inmates of the jail who were held for more than twenty-four hours after they became eligible for release because of the November 2014 GCIC outage. The Court certified their class. (Dkt. 105.) The class includes only those inmates who were eligible for release at the time (including having no other holds) but were detained as a result of the jail's decision to wait for the system to come back on-line. Plaintiffs allege Defendants Jackson and Adger falsely imprisoned them and illegally searched and seized them.

## II.    Standard of Review

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "No genuine issue of material fact exists if a party has failed to 'make a showing sufficient to establish the existence of an element . . . on which that party will bear the burden of proof at trial.' " *AFL-CIO v. City of*

*Miami*, 637 F.3d 1178, 1186–87 (11th Cir. 2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986). A fact is "material" if it is "a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

The moving party bears the initial responsibility of asserting the basis for its motion. *Celotex*, 477 U.S. at 323. The movant is not, however, required to negate the nonmovant's claim. *Id.* at 324. Instead, the moving party may meet her burden by " 'showing' — that is, pointing to the district court — that there is an absence of evidence to support the non-moving party's case." *Id.* After the moving party has carried its burden, the non-moving party must present competent evidence that there is a genuine issue for trial. *Id.*

The court must view all evidence and factual inferences in a light most favorable to the non-moving party. *Samples v. City of Atlanta*, 846 F.2d 1328, 1330 (11th Cir. 1988). But "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly

8

supported motion for summary judgment; the requirement is there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48.

## III.  Discussion

### A.    False Imprisonment

Defendants claim qualified immunity shields them from Plaintiffs' false imprisonment claim.   "Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (internal quotation marks omitted).  So "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011).   Qualified immunity allows officials to "carry out their discretionary duties without the fear of personal liability or harassing litigation." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002).  When properly applied, qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law." *al-Kidd*, 563 U.S. at 743 (internal quotation marks omitted).

Qualified immunity may attach only when the officer is "acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Grider v. City of Auburn*, 618 F.3d 1240, 1254 n.19 (11th Cir. 2010). A public official acts within the scope of his discretionary authority where the acts complained of were "undertaken pursuant to the performance of his duties and within the scope of his authority." *See Rich v. Dollar,* 841 F.2d 1558, 1564 (11th Cir. 1988). "Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Lee*, 284 F.3d at 1194. Defendants do not argue that they were not acting within the scope of their discretionary duties when not releasing Plaintiffs from the jail after they became eligible for release. Plaintiffs thus have the burden of showing that qualified immunity is unavailable to them.

The qualified immunity analysis presents two questions: first, whether the allegations taken as true establish the violation of a constitutional right; and second, if so, whether the constitutional right was clearly established when the violation occurred. *Hadley v. Gutierrez,* 526 F.3d 1324, 1329 (11th Cir. 2008). These distinct questions "do not

have to be analyzed sequentially; if the law was not clearly established, [the court] need not decide if the [d]efendants actually violated the [plaintiff's] rights, although [the court is] permitted to do so." *Fils v. City of Aventura*, 647 F.3d 1272, 1287 (11th Cir. 2011).  The burden thus lies with Plaintiffs to show that Defendants' actions violated a constitutional right and that the right was clearly established at the time of her arrest. *See Hadley*, 526 F.3d at 1329.

### 1.    Constitutional Violation

"A § 1983 claim of false imprisonment requires a showing of common law false imprisonment and a due process violation under the Fourteenth Amendment." *Campbell v. Johnson*, 586 F.3d 835, 840 (11th Cir. 2009).  "The elements of common law false imprisonment are an intent to confine, an act resulting in confinement, and the victim's awareness of confinement." *Id.*  "The Fourteenth Amendment Due Process Clause includes the right to be free from continued detention after it was or should have been known that the detainee was entitled to release." *Id.* (internal quotation marks and citation omitted).  To show a due process violation, a plaintiff must show the defendant acted with deliberate indifference. *Id.*  This means the plaintiff must show the

11

defendant "had subjective knowledge of a risk of serious harm and disregarded that risk by actions beyond mere negligence." *Id.* Knowledge of a serious harm and failure to act on that knowledge also constitutes deliberate indifference. *Id.*

Plaintiffs bring their claims against Defendants Jackson and Adger in their supervisory capacities. A defendant can be liable in such capacity only if "he personally participated in the allegedly unconstitutional conduct or his actions were casually connected to the alleged constitutional deprivation." *Id.; see also Valdes v. Crosby*, 450 F.3d 1231, 1236 (11th Cir. 2006). A "causal connection may be established when: 1) a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation and he or she fails to do so; 2) a supervisor's custom or policy results in deliberate indifference to constitutional rights; or 3) facts support an inference that the supervisor directed subordinates to act unlawfully or knew that subordinates would act unlawfully and failed to stop them from doing so." *Campbell*, 586 F.3d at 1327.

Viewing the facts in the light most favorable to them, Plaintiffs have presented evidence from which a jury could find common law false

imprisonment. Plaintiffs have shown Defendants and their subordinates knew GCIC went down. (Dkts. 112-4; 112-6 112-7.) They knew inmates were eligible for release. (Dkts. 112-5; 112-6; 112-8.) And they knew those inmates were not being released when the system went down.[2] (Dkts. 112-6; 112-7.) They intentionally held the inmates after they became eligible for release.

The record also contains evidence from which a jury could find Defendants' subordinates acted with deliberate indifference because they had actual knowledge they were continuing to detain inmates long after the inmates were entitled to be released. As explained above, when an inmate became eligible for release during the November 2014 GCIC outage, Defendants' subordinates still ran the inmate's name through the Odyssey system. (Dkt. 116-1 ¶ 16.) But then they just placed the inmate's file back in the cleared-for-release basket and waited for GCIC to come back online. (*Id.*) On Friday, they had forty-nine inmates sitting

---

[2] Defendants cite *White v. DeKalb County*, 665 F. App'x 795, 797 (11th Cir. 2016), for the proposition that supervisory jail officials cannot be held liable for false imprisonment for overseeing inmates. In that case, the Eleventh Circuit held that a supervisor may be so liable if "the supervisor directly participated in the unconstitutional conduct or if a causal connection existed between the supervisor's acts and the constitutional violation." *Id.* at 797. Plaintiffs in this case pursue such a claim.

idle in that basket, ninety-six by Monday.  (Dkts. 112-5; 112-8.)  That stack provides direct evidence they knew these inmates were eligible for release.  And, they did not begin releasing them for several more days until the system came back on-line on November 21, 2014.  (Dkts. 93-12 at 4; 114-6 at 7.)  This was not an accident or negligence.  It was the deliberate decision to hold inmates after they became eligible for release.

Plaintiff has presented other direct evidence of knowledge.  In an email, for example, a jail employee recognized that they were running the names through Odyssey so that, when GCIC came back on-line, they would only have to run the inmates' names through that system before releasing them.   (Dkt. 112-5.)   Other evidence shows Defendants' subordinates talking about the continued detention of inmates eligible for release.  (Dkts. 112-4; 112-6; 112-7; 112-8 112-10.)   This knowledge, and the failure to release the inmates, provides evidence from which a jury could find deliberate indifference.

Defendants argue their subordinates did not have subjective knowledge that they violated Plaintiff's constitutional rights.  Defendants claim the relevant emails do not explicitly discuss inmates being over-detained.  Of course they do.  A subordinate sent an email

stating that ninety-six inmates were ready to be released but were being held pending only GCIC checks. (Dkt. 112-8.)  A jury could read that email — and the other emails cited above — to show the subordinate's knowledge.  Plaintiffs also presented testimony from one of Defendants' subordinates in which she testified that she knew inmates entitled to release were being held during the outage.  (Dkts. 93-7 at 70:9-72:3; 116-1 ¶ 35.)  It makes no difference that the subordinates may not have put this together as a constitutional violation.  The law does not require that they understand the constitutional significance of holding inmates after they became eligible for release, only that they intended to hold them and that their actions violated the constitution.  Jail officials knew inmates eligible for release were not being released and thus had the required knowledge.

The record also reveals a genuine issue of material fact as to whether Defendants Jackson and Adger personally participated in Plaintiffs' false imprisonment or took other actions that caused the constitutional deprivation.  The evidence establishes that Defendants Jackson and Adger were aware of prior GCIC outages and knew those outages resulted in the continued detention of inmates.  Defendant Adger

testified that he knew of several GCIC outages prior to November 2014, including at least three during his time as the Jail Commander. (Dkt. 1-25 at 85:21–25.) He recalled one that occurred about a year before the November 2014 outage, lasted between one to two days, and prevented the release of twenty to thirty inmates; one that occurred at an unidentified time, lasted about three days and impacted about thirty to forty inmates; and one that happened a couple of months before the November 2014 outage, lasted two or three days, and impacted twenty to thirty inmates. (*Id.* at 87:16-90:25.) Defendant Adger testified that he knew that, during previous GCIC outages, the jail detained inmates for more than twenty-four hours after they became eligible for release. (Dkts. 1-25 at 90:15–21.)

Defendant Jackson also knew that the system had gone down before the November 2014 outage and that it caused inmates to be detained after they were eligible for release. (Dkt. 112-14 at 3:22–8:6.) He even adopted a procedure to minimize the number of inmates improperly held during outages by allowing the release of inmates who had been booked into the jail within eight hours of the outage or met certain other criteria not applicable here. (Dkt. 116-1 ¶ 38.)

Defendants knew Plaintiffs were being held during the November 2014 outage simply because of that outage. (*Id.* at 130:8–10.) In other words, they knew jail employees were holding inmates who were eligible for release until GCIC came back on-line. Defendant Jackson copied Defendant Adger on an email dated November 16, 2014, saying an inmate was detained more than forty-eight hours after becoming eligible for release. (Dkt. 112-6.) And GCIC did not function for four more days. A jury could certainly find Defendants knew inmates were being held by Defendants' subordinates more than twenty-four hours after they became eligible for release. And, it could certainly find Defendants knew inmates were being held simply because of the GCIC outage.

Defendants also had the ability to permit jail employees to release inmates during the November 2014 outage without running GCIC checks but chose not to do so. Defendant Jackson, for example, testified that he had the authority to instruct Defendant Adger and other jail employees to release inmates without running a GCIC check. (Dkt. 112-14 at 11:3–25.) He stated unequivocally that he had the right to waive the GCIC requirement and "specifically remembered not authorizing a release without a GCIC check in November of 2014." (*Id.* at 12:5-12.)

Defendants claim Defendant Adger was not deliberately indifferent or responsible for any constituional violation because he believed "legally GCIC required a criminal history be run on an inmate prior to release." (Dkt. 109-1 at 5.)  He actually testified that he simply thought this was the Sheriff's policy and a GCIC rule — not any kind of legal requirement. (Dkt. 1-25 at 116:25–117:19.)    Contrary to Defendants' allegation, Defendant Adger testified that he could release inmates without running the inmate's name through GCIC. (Dkt. 1-25 at 119:15–18.)  He testified that he knew he had the authority to release inmates without running GCIC checks but did not do so during the outage because he did not want to release inmates "back into the community where there is a public safety concern." (*Id.* at 120:1–22.)  Rather than using his authority to release inmates, he decided to wait to see how long the system would be down. (*Id.*)

From this evidence a jury could certainly conclude Defendants Jackson and Adger personally participated in the unconstitutional conduct.  "Personal participation occurs when [ ] the supervisor inflicts the injury himself." *Smith v. LePage*, 834 F.3d 1285, 1298 (11th Cir. 2016).  A jury could conclude that they caused jail employees to hold

inmates by intentionally keeping the requirement of a GCIC check in place when the system went down.

Defendants argue they never met or interacted with any specific plaintiff, thus preventing a jury from finding that they personally participated in any alleged constitutional deprivation. The Court recognizes that these facts are different from a typical case of personal participation. *See, e.g.. Smith*, 834 F.3d at 1298 (finding officer did not personally participate when the officer did not personally shoot a suspect); *H.C. by Hewett v. Jarrard*, 786 F.2d 1080, 1087 (11th Cir. 1986) (finding that jail superintendent personally participated in the constitutional violation because he "inflicted the injury to [the plaintiff's] shoulder when he threw [the plaintiff] against the wall and metal bunk in the isolation cell"). But, the undisputed evidence suggests that — at some point during the outage — both Defendants became aware of the outage, knew that inmates eligible for release were being held, and specifically decided to keep the GCIC requirement in place. Regardless of whether Defendants knew the identity of any specific inmate or personally refused, a jury could conclude Defendants personally participated in the detention of inmates held after they knew of the

outage and decided to keep the GCIC requirement in place. *See Purvis v. City of Atlanta*, 142 F. Supp. 3d 1337, 1346 (N.D. Ga. 2015) (denying motion to dismiss personal participation claim against sheriff because he "plausibly was or should have been aware of serious problems with the clearance of warrant records in his department that would directly impinge on the liberty interests of affected citizens by refused or failed to take any action sufficient to address these problems").

A jury could also find there was a causal connection between Defendants' actions and the constitutional deprivation under all three supervisory liability criteria established by the Eleventh Circuit in *Valdes*. The evidence, for example, would permit a jury to conclude there was a history of widespread abuse, that Defendants Jackson and Adger knew of the need to correct the alleged constitutional violation, and that they failed to do so. *Valdes*, 450 F.3d at 1237. The evidence is also sufficient for a jury to find that there was a custom or policy that resulted in the deliberate indifference to constitutional rights, specifically the policy of requiring GCIC checks before releasing an inmate even when the system was down. *Harper v. Lawrence Cty.*, 592 F.3d 1227, 1236 (11th Cir. 2010) (finding one prior incident sufficient to establish custom

or policy that resulted in deliberate indifference to constitutional rights).

Finally, the facts certainly support the inference that Defendants "directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." *Id.*  Both Defendants admitted they specifically decided not to waive the GCIC check requirement during the November 2014 outage so that jail employees could release inmates entitled to be released.

Defendant Jackson argues that, regardless of whether his subordinates may have been deliberately indifferent, he was not because he tried to mitigate Plaintiffs' over-detention.[3]  He explains that, when he learned of the GCIC outage, he told his Chief Deputy to call the Georgia Bureau of Investigation, the state agency in charge of GCIC, to help get the database working.  According to Defendants, Defendant Jackson's actions ensured GCIC worked earlier than it otherwise would have.  (Dkt. 109-3 ¶ 18.)[4]

---

[3] Defendants also argue Defendant Adger tried to mitigate the impact of the GCIC interruption.  (Dkt. 116 at 5.)  They argue he took steps to release inmates from custody who were charged with misdemeanors.  (Dkt. 93-12.)  He began working on that plan **after** the November 2014 outage at issue in this case.  (*Id.*)

[4] Plaintiff seeks to exclude the affidavits of Terri Fisher and Kathy Fluellen and an attached email chain because they were not disclosed

But whether the Chief Deputy's phone call got GCIC working sooner is a question of fact. And perhaps irrelevant. Defendant Jackson testified that, rather than suspending the need for GCIC tests, he placed this call or had someone else place it. He said he told his Chief Deputy to call GBI "to see if anything could be done." (Dkt. 112-14 at 12:19–13:4.) Defendant Jackson noted, however, that he expected nothing specific from this call. *Id.* ("There is nothing we can do, but I feel we have an obligation to at least check it."). Given Defendant Jackson's belief that this phone call would amount to nothing, along with his authority to alleviate Plaintiffs' constitutional injury in a different way — releasing Plaintiffs without GCIC checks when the system was down — a jury could find Defendant Jackson acted with deliberate indifference. *See Hale v. Tallapoosa Cty.*, 50 F.3d 1579, 1583 (11th Cir. 1995) ("[A] jury could reasonably find that [the sheriff] 'failed to take reasonable measure to abate' a known risk of harm if the evidence showed he knew of ways to

---

until Defendants moved for summary judgment. (Dkt. 113.) Defendants had the duty to disclose these emails and these witnesses. As Defendants did not do so, the Court does not take them into consideration here. The Court addresses the argument below, which relies on these excluded documents, only to show that the result of this litigation would not change even if the Court considered these documents.

reduce the harm but knowingly declined to act, or that he knew of ways to reduce the harm but recklessly declined to act.").

Defendants Adger and Jackson argue that they cannot be held liable as supervisors because they did not know the jail held inmates more than twenty-four hours past when they became eligible for release during a GCIC outage. As explained above, the record suggests otherwise. And, most importantly, they knew the jail was not releasing inmates simply because the GCIC system was down. There is nothing magical about twenty-four hours. The injury arose here because Defendants' subordinates failed to release Plaintiffs who were entitled to be let go.

### 2.    Clearly Established Law

Defendants argue that even if they violated the law, they did not violate clearly established law. For the law to be clearly established, a plaintiff can (1) point to a materially similar case, (2) show a broader, clearly established principle that should control the novel facts of the situation; or (3) establish that the conduct involved in the case may so obviously violate the constitution that prior case law is unnecessary. *Echols v. Lawton*, 913 F.3d 1313, 1324 (11th Cir. 2019.) The first scenario

does not require a prior case that is "directly on point" or factually the same, but "existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741. The second scenario recognizes that "some broad statements of principle in case law [that] are not tied to particularized facts . . . can clearly establish law applicable in the future to different sets of detailed facts." *Id.* (quoting *Vinyard v. Wilson*, 311 F.3d 1340, 1351 (11th Cir. 2002)). The principle must establish with "obvious clarity" that "in the light of pre-existing law the unlawfulness [of the official's conduct is] apparent."

Plaintiff has established the first two scenarios. Taking the second first, the Court previously recognized in its Order on Defendants' Motion to Dismiss, "[t]he bottom line is that plenty of binding cases establish a 'constitutional right to be free from continued detention after it was or should have been known that the detainee was entitled to release.'" (Dkt. 16 at 27 (quoting *Cannon*, 1 F.3d at 1563)); *see also Campbell*, 586 F.3d at 840 ("The Fourteenth Amendment Due Process Clause includes the 'right to be free from continued detention after it was . . . known that the detainee was entitled to release.'"); *Whirl v. Kern*, 407 F.2d 781, 791 (5th Cir. 1968) ("There is no privilege in a jailer to keep a prisoner in jail

beyond the period of his lawful sentence."). Plaintiffs have shown a clear principle that controls the facts here.

Plaintiffs have also shown a materially similar case. At the time of the November 2014 incident, the Eleventh Circuit had already held that a sheriff violates an inmate's constitutional rights when he knows the inmate is eligible for release and intentionally delays his or her release. In *Campbell,* the plaintiff alleged that, after a judge granted him bail and approved his use of certain property as security for the bond, the sheriff refused to release the plaintiff because he did not want to accept the out-of-county property as collateral. 586 F.3d at 838–39. The Eleventh Circuit recognized the principle that "[t]he Fourteenth Amendment Due Process Clause includes the right to be free from continued detention after it was . . . known that the detainee was entitled to release." *Id.* at 840. The court then recognized that plaintiff had presented evidence from which a jury could conclude (1) the sheriff knew the plaintiff was eligible for release based on his posting of the property and (2) the sheriff directed the jail not to accept his posted property. *Id.* at 840–41. The Eleventh Circuit held that this evidence, if accepted by a jury, would establish a violation of the plaintiff's Fourteenth Amendment rights and

reversed the district court's grant of summary judgment for the sheriff. *Id.*

For sure, this case does not involve Defendant's refusal to accept an approved property bond. But, that level of similarity is not necessary. *Campbell* would have placed Defendants on notice that — when they know an inmate is lawfully entitled to release — they cannot further detain that inmate because they want or require something else. There is little or no difference in holding an inmate because you want the inmate to post in-county property and holding an inmate because you want to run a background check. Neither are lawfully required and both delayed a lawful order of release.

Defendants argue they did not violate clearly established law because holding inmates past their release date to perform an administrative task is constitutional. But that is not what happened here. Defendants did not delay Plaintiffs' release while performing administrative tasks. The administrative task Defendants wanted jail employees to perform became impossible when the GCIC system went down. After that, jail employees may have accomplished other administrative tasks necessary for release (like Odyssey checks) but,

26

having done that, the employees stopped the inmates' releases. They simply stacked up those files in anticipation of a time when they would be able to perform another administrative task. They were not legally required to run GCIC checks. It was an impediment to release Defendants created for their own purposes, knew existed, and decided not to remove.

This is nothing like the situation in *Golberg v. Hennepin County*, 417 F.3d 808 (8th Cir. 2005), one of the cases Defendants cite in support of their claim for qualified immunity. In that case, a jail kept an inmate otherwise eligible for release because the inmate "was lost in the computer system for several hours," not because a jail official decided to hold her. *Id.* at 812. This case is also not like *Stojcevski v. County of Macomb*, 143 F. Supp. 3d 675 (E.D. Mich. 2015), another case Defendants cite. In that case, the district court dismissed the plaintiffs' false imprisonment claim because plaintiff did not even allege the defendants knew he was entitled to be released. *Id.* at 691.

Defendants also cite *Brass v. County of Los Angeles*, 328 F.3d 1192, 1199 (9th Cir. 2003), while Plaintiffs cite *Berry v. Baca*, 379 F.3d 764 (9th Cir. 2004). Those cases involved attacks on the Los Angeles County

Sherriff's procedures for releasing inmates after they became eligible for release. In both cases, the plaintiffs alleged that the sheriff's release process took too long. Specifically, the plaintiff in *Brass* claimed the Sheriff's policy of processing court-ordered releases only after processing all other releases led to his unconditional detention. 328 F.3d at 1200. In *Berry*, the plaintiff argued that the county's release protocols simply took too long. 379 F.3d at 768.

That is not what Plaintiffs allege in this case. They do not allege the inclusion of GCIC checks in the release process violated their rights because it caused the process to take too long. Instead, the crux of Plaintiffs' argument is that — when GCIC checks were no longer possible as part of a release protocol — Defendants violated their rights by continuing to hold them. It's not the process; it's the demand that the process be followed when impossible to do so and the unconstitutional detention that resulted from that demand.

Plaintiffs have shown both a materially similar case that would have put Defendants on notice that their conduct violated Plaintiffs' clearly established rights and that broader, clearly established principle that should control the novel facts of the situation. The Court denies

28

Defendants' motion for summary judgment as to their individual capacity claims.

## B.    Fourth Amendment Claim

Plaintiffs argue their over-detention was an illegal seizure in violation of the Fourth Amendment.  Plaintiffs cite no case law showing a delayed release from jail to implicate the Fourth Amendment.  As Defendants point out, over-detention Fourth Amendment claims typically involve continued detention based on an independent violation. *See Alcocer v. Mills*, 906 F.3d 944, 952–53 (11th Cir. 2018). The Court grants Defendants summary judgment on the Fourth Amendment claim.

## C.    *Harper* Decree

The parties discussed the so-called *Harper* Consent Decree, a settlement to a prior lawsuit involving conditions at the jail.  *See* Order, *Harper v. Fulton Cty.*, No. 1:04-cv-01416 (N.D. Ga. Dec. 21, 2005), Dkt. 89.  Defendants says that the consent decree does not apply a "bright-line rule for the jail" and has no bearing on this case.  (Dkt. 109-1 at 24.) Alternatively, they say the consent decree is res judicata and bars Plaintiffs' claim.  The Court agrees with Defendants' initial position.  The consent decree may have required the jail to release inmates within

twenty-four hours of when they became eligible for release. But Plaintiffs are not suing for violation of the consent decree. They are alleging a constitutional violation. Defendants' compliance with the consent decree does not isolate them from liability for conduct that violates Plaintiffs' rights. Likewise, their alleged violation of the consent decree does not expose them to liability absent a constitutional violation.

### D.    Injunctive Relief

Defendants argue Plaintiffs lack standing to pursue injunctive relief. Defendants are correct that they can challenge standing at any point in the litigation. *See Nunnelee v. United States*, 972 F. Supp. 2d 1279, 1281–82 (N.D. Ala. 2013) ("[A] jurisdictional deficiency can be raised at any time by either the parties or the court."). Given that Defendants made this argument in their reply, Plaintiffs did not respond to this argument. If Plaintiffs continue to seek injunctive relief, Plaintiffs may submit briefing responding to Defendants' arguments. The Court will set a briefing schedule on the issue of injunctive relief if this matter is not resolved at mediation.

## IV.   Conclusion

The Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion Summary Judgment (Dkt. 109).   The Court **GRANTS** the motion on the Fourth Amendment claim but **DENIES** the motion on the false imprisonment claim and the applicability of the *Harper* Decree.

The Court **ORDERS** this case to mediation.  The parties may retain the mediator to mediate this case.  The expense of a retained mediator must be paid by the parties.  The parties, alternately, may request that the Court appoint a magistrate judge to conduct the mediation.  The parties are not required to pay for mediation by a magistrate judge.

The parties shall advise the Court, on or before April 15, 2020, of their mediation preference.  If they elect to retain their own mediator, the parties shall identify the mediator on or before April 29, 2020.  The parties must have present at the mediation a person with authority to settle this litigation.

The parties shall, within five days after the mediation, notify the Court in writing whether mediation led to a settlement of this action.

31

The Court **STAYS** this case pending mediation.   The Court **DIRECTS** the Clerk to **ADMINISTRATIVELY CLOSE** this case during the period of the stay.

**SO ORDERED** this 18th day of March, 2020.


MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE